PEOPLE v LAIDLAW

Docket No. 97901. Submitted April 14, 1988, at Lansing. Decided June 6, 1988.

Marshall Michael Laidlaw, following a bench trial in the Oakland Circuit Court, David F. Breck, J., was convicted and sentenced to prison as follows: entry without permission, ninety days; two counts of breaking and entering an occupied dwelling with intent to commit larceny, ten to fifteen years; assault with intent to commit criminal sexual conduct involving sexual penetration, 8½ to 10 years; two counts of first-degree criminal sexual conduct, fifty to one hundred years on one count and life imprisonment on the other; breaking and entering an occupied dwelling with intent to commit larceny, ten to fifteen years; and unlawfully driving away an automobile, three to five years. Defendant then pled guilty to being an habitual offender, second offense, and the life sentence for first-degree criminal sexual conduct was vacated and defendant was resentenced to life imprisonment on the habitual offender conviction. Defendant appealed.

The Court of Appeals held:

1. Where, as here, no claim is made that the lineup procedures used in a witness' pretrial identification of the defendant were improper or unduly suggestive, an independent basis for an in-court identification need not be established.

2. A sufficient foundation was laid for the admission of evidence of defendant's identification by a tracking dog and there was ample, other evidence in support of defendant's conviction.

3. Trial counsel's failure to request a hearing regarding the procedures used in the pretrial identification of defendant did not result in ineffective assistance of counsel since the record did not reflect, nor did defendant articulate, reasons for finding the pretrial lineup improper.

4. The trial court did not err in admitting evidence regarding

REFERENCES

Am Jur 2d, Criminal Law §§ 542, 606, 674, 732 et seq., 798-802.
Am Jur 2d, Evidence §§ 378, 379, 1146.
See the Index to Annotations under Criminal Law.

hair samples found on the criminal sexual conduct victim, which samples were not inconsistent with hair samples from defendant.

5. The 8½ to 10 year sentence on the assault with intent to commit criminal sexual conduct involving penetration violates the indeterminate sentence act because the minimum exceeds two-thirds of the maximum. The sentence is reduced to 80 months to 120 months.

Affirmed as modified.

1. CRIMINAL LAW — WITNESSES — PRETRIAL IDENTIFICATIONS.

The danger of an improperly conducted pretrial lineup identification is that it may unduly influence subsequent identification, and an in-court identification may be made on the basis of the pretrial identification rather than from an independent recollection of the crime; thus, an independent basis for an in-court identification must be established where the pretrial identification is tainted by improper procedure or unduly suggestive comments.

2. CRIMINAL LAW — TRACKING-DOG EVIDENCE.

Tracking-dog evidence is admissible in criminal cases where a proper foundation is laid which will show: (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it; tracking-dog evidence standing alone cannot support a criminal conviction.

3. CRIMINAL LAW — APPEAL — ASSISTANCE OF COUNSEL.

Generally, a motion for new trial or an evidentiary hearing is a prerequisite to appellate review of a claim of ineffective assistance of counsel; however, the absence of such motion is not fatal to appellate review where the details relating to the alleged deficiencies of the defendant's trial counsel are sufficiently contained in the record to permit the Court of Appeals to reach and decide the issue.

4. CRIMINAL LAW — ASSISTANCE OF COUNSEL.

The standard to determine whether a defendant had effective assistance of counsel in a criminal trial is that defense counsel must have performed at least as well as a lawyer with ordinary training and skill in the criminal law; a defendant is denied effective assistance of counsel where, but for counsel's serious mistake, he would have had a reasonable chance of acquittal.

5. CRIMINAL LAW — ASSISTANCE OF COUNSEL.

A defendant's trial counsel is presumed to have provided effective assistance to the defendant; to overcome this presumption, the defendant must show that his counsel failed to perform an essential duty and that the failure prejudiced the defendant.

6. EVIDENCE — APPEAL.

Generally, failure to object to the admission of evidence at trial constitutes a waiver of any appellate challenge; before error may be asserted concerning the admission of evidence, the record must show a timely objection or motion to strike stating the specific grounds and a substantial right of the party affected by the claimed erroneous ruling.

7. CRIMINAL LAW — SENTENCING — INDETERMINATE SENTENCES — MINIMUM SENTENCES.

The minimum term of an indeterminate sentence may not exceed two-thirds of the maximum term allowable (MCL 769.8, 769.9; MSA 28.1080, 28.1081).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief, Appellate Division, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for the people.

*Gerald M. Lorence,* for defendant on appeal.

Before: BEASLEY, P.J., and H. HOOD and R. L. TAHVONEN,* JJ.

BEASLEY, J. In a nonjury trial, defendant, Marshall Michael Laidlaw, was convicted of eight criminal offenses. These offenses and the sentences imposed are:

(1) Entry without permission, contrary to MCL 750.115; MSA 28.310, ninety days.

(2) and (3) Two counts of breaking and entering an occupied dwelling with intent to commit larceny, contrary to MCL 750.110; MSA 28.305, not

---

* Circuit judge, sitting on the Court of Appeals by assignment.

less than ten years nor more than fifteen years in prison.

(4) Assault with intent to commit criminal sexual conduct involving sexual penetration, contrary to MCL 750.520g; MSA 28.788(7), not less than 8½ years nor more than 10 years in prison.

(5) and (6) Two counts of first-degree criminal sexual conduct, contrary to MCL 750.520b; MSA 28.788(2), not less than fifty years nor more than one hundred years in prison on one count and life imprisonment on the other count.

(7) Breaking and entering an occupied dwelling with intent to commit larceny, contrary to MCL 750.110; MSA 28.305, not less than ten years nor more than fifteen years in prison.

(8) Unlawfully driving away an automobile, contrary to MCL 750.413; MSA 28.645, not less than three years nor more than five years in prison.

Then, defendant pled guilty to being an habitual offender, second offense, contrary to MCL 769.10; MSA 28.1082, after which the life sentence for first-degree criminal sexual conduct was vacated and defendant was resentenced to life imprisonment based on the habitual offender plea. Defendant now appeals as of right, raising four issues.

First, defendant claims that there was not sufficient evidence identifying him as the perpetrator of the offenses. The testimonial record of this crime spree indicates the contrary. These charges arise out of a connected series of incidents that occurred in Bloomfield Hills beginning in the early morning hours of Saturday, August 17, 1985.

Florence Miller testified that she was awakened about 4:00 A.M. by a tall young man leaning over her and whispering, "I've got a gun." Defendant never demanded anything of her, but kept repeating that he had a gun. Miller's response was to

shout at him to get out. When her startled hus-
band awoke, the intruder left. When Miller tried
to use the phone to call the police, she discovered
that the receivers had been removed from various
extensions. Although she did not originally notice
anything missing from the house, she later identi-
fied some towels of hers found in a car that defen-
dant had used. Although Miller did not positively
identify defendant as the man, she did testify that
defendant looked like the man that was in her
home.

Jim Nagy, sixteen years old at the time of the
incident, testified that his parents and his brother
were away that weekend, but that he and his
sister were home. Jim was awakened about 6:26
A.M. by the family dog scratching on his bedroom
door. When he opened the door to let the fright-
ened dog in, he saw a man standing at the foot of
his parents' bed. Groggy from sleep and not realiz-
ing his sister was in the parents' bedroom, he let
the dog in and returned to bed. About the time
that he began to realize that a stranger was in the
house, his bedroom door opened and a man, with
tube socks on his hands, entered. Calling Jim by
name, the man instructed him to keep his head on
the pillow and not to move. Jim stayed in his room
until a police officer came to get him. At trial, Jim
identified defendant as the person who was in his
bedroom that night.

Jim's nineteen-year-old sister, Christine Nagy,
testified that she was sleeping in her parents'
bedroom that night because it was cooler. That
bedroom has a sliding glass door which opens onto
a balcony. The glass door was open, but the screen
was shut. She was awakened by pressure on the
back of her head and shoulders. She then heard a
voice tell her that if she did not say anything, she
would not be hurt. This statement was repeated

several times in a nervous, fast, sort of whispered voice. When she asked him what he wanted, the man responded in vulgar terms that he desired sex. After ascertaining that the home had only one phone line, he took the receiver off the hook in the master bedroom. She could not see much, but said the man was slimy, muddy and smelled bad.

The family dog, which had been sleeping with her, jumped off the bed and left the room. She heard her brother open his door to let the dog in. In answer to the man's question, she informed him that her brother Jim was home. At that point, the man left the room, but returned before she could get a dial tone on the phone.

When the man grabbed at her covers and again indicated his desire, she yanked the covers back up and told him she had herpes. He then asked for money or keys to a car. After she denied she had either, he left the room. Christine then left the house by jumping off the balcony. As she was struggling to her feet, she saw the man looking down at her. She then ran to a neighbor's house for help. Just as she entered the neighbor's house, she saw the same man running in between the houses. The neighbors then called the police.

Another woman testified that her dog awakened her with furious barking between 6:30 and 7:30 A.M. She got up and opened the sliding glass door of her condominium to let the dog out. She then closed the screen door and started toward the bedroom door to use the bathroom down the hall. When she heard the screen door start to open, she turned and saw a man approaching her with his hands in front of his face. Because of the back lighting of the sun, she could not see his face, but saw that he had "loose material" on both of his hands. He told her he would not hurt her and to get on the bed. He then crudely indicated he

intended to have sex. He performed cunnilingus on her and then succeeded in penile penetration of her vagina. He asked if she had a car and where he was. After she denied she had a car and told him where he was, he went and opened a closet door, then left towards the front door. At this point, she hit her security panic button. Police officers, already in the area, soon arrived with a police dog, but did not catch anyone in her home. She was taken to a hospital where a sexual assault kit was prepared. When she returned home, she found a pair of tube socks on her bed. She was unable to identify defendant as the man who raped her.

The next place a strange man was seen in the area was at the Kammer residence. At about 7:35 A.M., an unknown man drove the Kammer station wagon out of the driveway. They did not discover the car missing until about 8:30 A.M. when the police asked them to check. They found a set of keys in the car which had been in the Kammer house the night before. Some of the clothing defendant was wearing when he was arrested had been inside the Kammer house before the incident.

Greg Brighton, a Bloomfield Hills police officer, testified that he discovered a disabled car in a church parking lot at the corner of Woodward and Chesterfield about 2:30 A.M. At that time, he observed a pool of vomit near the car, but saw no towels in or near it. The car belonged to Billie Jean Dixon, who had loaned the car to defendant in the afternoon of the previous day. At about 9:00 A.M., another Bloomfield Hills police officer, Russell May, discovered some towels in the vehicle. He later took the same towels out of the police department property room and took them to Miller, who identified two of them as being hers.

Lawrence Jackson, a Bloomfield Township police

officer, testified that he was called in to help secure the perimeter of the area being searched for the man who had entered some houses. From his position on the perimeter, he observed a man driving a station wagon out of the Kammer driveway. When he followed the car and turned on his overhead lights, the car turned up the next driveway, accelerated, then stopped abruptly when it crashed into an obstacle. The driver jumped out of the car and ran. Jackson took his shotgun and ran after the man, but did not apprehend him. Instead, he radioed the man's description, location and the direction in which he was running.

Charles Marchessault, another Bloomfield Township police officer, at the request of the Bloomfield Hills police department, arrived in the area with his police dog, Blitz, just after 6:30 A.M. Blitz was tracking the scent near the condominium when Jackson's radio call informed Marchessault where a suspect had been seen. Another officer drove Marchessault and Blitz to a spot closer to the sighting. He saw the suspect running and called to him to halt or he would set the dog on him. Blitz caught up with the running defendant and "indicated" that this was the person whose scent he was tracking.

Charlotte Day, a State Police crime lab scientist, testified that the swabbings taken from the rape victim, as well as her panties, showed the presence of semen. Under microscopic comparison, two foreign hairs, which were found on the victim's bed sheet, corresponded to the known pubic hairs from defendant. Although she could not say with certainty that the two hairs originated from defendant, the two sets could not be distinguished.

On appeal, defendant complains that identification testimony of Jim and Christine Nagy and

Miller should have been subjected to a *Wade*[1] hearing because they each participated in an out-of-court lineup identification of defendant following his arrest. No objection was made at trial to the admission of this testimony, and the record reflects no motion for new trial has been brought before the trial court.

In *People v Anderson*,[2] the Supreme Court set out the pretrial identification rules established by United States Supreme Court precedent. Defendant does not assert that he was not represented by counsel at the pretrial corporeal lineup, or argue that the procedures were unduly suggestive, thereby resulting in possible "irreparable misidentification." Defendant does not complain that direct testimony concerning the pretrial identification was elicited (although that, indeed, is the case here). Defendant appears to argue merely that any time a pretrial lineup occurs, the prosecutor must affirmatively show that the subsequent in-court identification has an independent basis. But this is not the law.

The need to establish an independent basis for an in-court identification only arises where the pretrial identification is tainted by improper procedure or unduly suggestive comments.[3] In *People v Carter*,[4] our Supreme Court stated:

> The great danger of an improper procedure is that an initial misidentification may unduly influence any subsequent identification. Thus, a court-room identification may be made on the basis of

[1] *United States v Wade*, 399 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

[2] 389 Mich 155, 168-169; 205 NW2d 461 (1973).

[3] See *People v Ray*, 156 Mich App 31, 52; 401 NW2d 296 (1986), lv gtd on other grounds 428 Mich 910 (1987).

[4] 415 Mich 558, 598; 330 NW2d 314 (1982).

the initial photographic showup or corporeal lineup rather than from an independent recollection of the crime. *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); *People v Anderson,* [389 Mich 155; 205 NW2d 461 (1973)].

To guard against this possibility, if a pretrial identification has been improperly conducted, an independent basis for any in-court identification must be established.

In the within case, defendant does not articulate any reason to find the lineup procedures improper, and there is nothing on the record to suggest that the procedures used in the lineup were unduly suggestive. We conclude that defendant's arguments concerning identification are without basis.

Defendant also complains that the evidence that the tracking dog, Blitz, apparently recognized defendant at apprehension should not have been admitted or the trial court should have ignored it. In *People v Harper,*[5] this Court set out the foundation required for admitting tracking-dog evidence, stating that the prosecutor must show that

(1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it.

Due to varying skills of dogs and their handlers, as well as the possibility that a jury may give more weight to dog-tracking evidence than it is entitled to, there must be other corroborating evidence presented before identification is suffi-

[5] 43 Mich App 500, 508; 204 NW2d 263 (1972), lv den 389 Mich 759 (1973).

cient to support a guilty verdict.[6] The police officer responsible for the tracking dog testified that he had been a police officer for nine years, six of which were spent in the canine division. He trained Blitz for one year before placing him in service in April, 1984. He also testified to his training in police-dog work, and that he was currently a trainer recognized by the North American Police Work Dog Association. Blitz had also passed that association's tests. Defense counsel stipulated to the officer's qualifications as an expert in dog handling and training.

Blitz was started on the track at the Nagy address, just inside the garage near the door. He took up a tracking posture and led Marchessault to the rape victim's condominium complex. Blitz worked a particularly strong scent, but was interrupted by a radio call that a man had been spotted. The officer and tracking dog were taken to the location of the spotting, where the officer saw defendant running. After giving defendant a warning to stop, he commanded Blitz to apprehend. When defendant saw Blitz about to catch him, he stopped. Blitz ran up to defendant and barked. Barking was an indication that Blitz had found the source of the scent. While Blitz only apprehended defendant because of the command to do so, he reacted with signs that he recognized defendant to be the source of the scent he had been tracking earlier.

Here, it is not claimed that Blitz continuously tracked defendant to where he was found. Rather, Blitz only recognized defendant as the source of the scent, once he apprehended him. However, this foundation for admission and consideration of evi-

---

[6] *People v McPherson,* 85 Mich App 341, 343; 271 NW2d 228 (1978), lv den 405 Mich 841 (1979); *People v O'Brien,* 113 Mich App 183, 208-209; 317 NW2d 570 (1982).

dence concerning Blitz meets the *Harper* require-
ments. Moreover, the trial court's findings are
based on far more than just Blitz's tracking of
defendant. There is abundant corroborating evi-
dence in this case, from the essentially identical
descriptions given by eyewitnesses, to the towels
found in defendant's car, and the fact that he was
wearing a sweatshirt stolen from the Kammer
household when he was arrested. In addition, the
court had the now challenged in-court identifica-
tions of three eyewitnesses and matching pubic
hairs. Defendant's claims in this regard fall for
lack of merit.

Second, defendant claims he was denied effective
assistance of counsel when his attorney failed to
request a *Wade* hearing. Generally, a motion for
new trial or an evidentiary hearing is required
before appellate review of a claim of ineffective
assistance of counsel.[7] However, where the record
contains sufficient details relating to the alleged
deficiencies in representation to allow this Court to
adequately analyze the issue, the absence of a
motion for new trial will not preclude appellate
review.[8]

Michigan has adopted a bifurcated test to deter-
mine whether a defendant has been denied effec-
tive assistance of counsel.[9] First, defense counsel
must perform at least as well as a lawyer with
ordinary training and skill in the criminal law.
Further, although satisfying the first test, counsel
must also make a serious mistake, but for which
defendant would have a reasonable chance of ac-
quittal. A represented defendant is presumed to
have received effective assistance. To overcome

---

[7] *People v Lawson,* 124 Mich App 371, 373; 335 NW2d 43 (1983).

[8] *People v Cicotte,* 133 Mich App 630, 636; 349 NW2d 167 (1984).

[9] *People v Garcia,* 398 Mich 250, 264; 247 NW2d 547 (1976); see also
*People v Dalessandro,* 165 Mich App 569; 419 NW2d 609 (1988).

this presumption, defendant has the burden to show that his counsel failed to perform an essential duty, and that that failure prejudiced defendant.[10]

The record here does not support defendant's ineffective assistance of counsel claim. As previously indicated, the record does not reflect, nor does defendant articulate, reasons for finding the pretrial lineup improper. This would be the only basis for requesting a *Wade* hearing. We do not believe that defendant has met his burden to show that counsel failed to perform an essential duty, or that the failure prejudiced defendant. Moreover, a review of the record indicates defense counsel closely questioned the identifying witnesses on cross-examination. This claim is without merit.

Third, defendant claims that the trial court erred by admitting scientific evidence identifying him without a proper foundation. Generally, failure to object to the admission of evidence at trial constitutes a waiver of any appellate challenge.[11] Before error may be asserted concerning the admission of evidence, the record must show a timely objection or motion to strike stating the specific grounds and a substantial right of the party affected by the claimed erroneous ruling.[12]

The admissibility of hair samples has been previously addressed by this Court and, in each instance, found proper.[13] In the within case, the police expert testified that the matching of these hairs did not show absolutely that they originated

[10] *People v Carr,* 141 Mich App 442, 451; 367 NW2d 407 (1985).

[11] *Taylor v Lowe,* 372 Mich 282; 126 NW2d 104 (1964).

[12] MRE 103(a)(1). See *People v Furman,* 158 Mich App 302, 330; 404 NW2d 256 (1987), lv den 429 Mich 851 (1987).

[13] *People v Hayden,* 125 Mich App 650, 658; 337 NW2d 258 (1983), rev'd in part on other grounds 404 Mich 807 (1978); *People v Browning,* 106 Mich App 516, 524-525; 308 NW2d 264 (1981), lv den 419 Mich 852 (1984).

from the same source. She could only say that they were not distinguishable and, therefore, not inconsistent with being from the same source. This is exactly what the trial court adopted in its findings of fact.

Defendant's other argument concerning the reliability of the tests performed on the evidence is not well founded. We do not believe any error occurred in the admission of the laboratory evidence.

Fourth, defendant claims that the trial court erred in imposing an 8½- to 10-year prison sentence on the assault with intent to commit criminal sexual conduct involving penetration. We agree. Under *People v Tanner*,[14] this sentence violates the indeterminate sentence act.[15] The longest minimum sentence that could be validly imposed was two-thirds of the maximum. Accordingly, we reduce defendant's sentence for that offense to not less than 80 months nor more than 120 months in prison.

Consequently, we affirm defendant's convictions and sentences, except that we modify his sentence for assault with intent to commit criminal sexual conduct involving penetration as indicated above.

Affirmed as modified.

[14] 387 Mich 683; 199 NW2d 202 (1972).
[15] MCL 769.8; MSA 28.1080 and MCL 769.9; MSA 28.1081.