601 N.W.2d 378 (1999)
PEOPLE of the State of Michigan, Plaintiff-Appellee,
v.
Michael C. WARINNER, Defendant-Appellant.
Docket No. 109717, COA No. 193327.
Supreme Court of Michigan.
October 20, 1999.
On order of the Court, the application for leave to appeal from the April 15, 1997, decision of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.
The Court of Appeals held that the trial court properly denied the admission of tracking dog evidence because the foundational requisites were not established. If there was any error in the exclusion of the tracking dog evidence, it was harmless. Further, we agree with the Court of Appeals that the trial court improperly excluded evidence that a third party may have had motive to kill the victim. After reviewing the entire record, however, we conclude, as did the Court of Appeals, that any error in excluding this evidence was harmless.
The evidence in the record shows that defendant told several witnesses that he was angry with the victim and wanted him dead. At the time of the shooting, defendant gave no less than five different alibis for his whereabouts on the evening of the shooting. He told one witness that he was partying with another couple at the apartment complex. Defendant told another witness that he was at a bar with a friend and "had a couple beers, smoked some joints, did a couple lines...." He told a third witness that he had gone to a bar and played darts with three other people, went to a second bar for a couple of drinks and then returned to the first bar. The third witness testified that defendant denied being at the apartment complex in Canton on the evening of the shooting.
Initially, defendant told police that he and his wife had gone to two bars the evening of the shooting, had stayed out until after the bars closed and "didn't go anywhere else." This story, however, was not consistent with the statement given by defendant's wife. When defendant was confronted with this inconsistency by police, he insisted on being told the contents of his wife's statement before making any further statements. After police revealed Mrs. Warinner's statement, defendant said "okay, okay, now I remember." Defendant then told police he went to the bar with his wife and returned home. He decided to go back out, instructing his wife to pick him up at victim's apartment complex at 10:00 p.m. Defendant stated he got into a "dope" man's car at the corner of his block. According to defendant, he and the "dope man" drove around smoking marijuana. He was dropped off at Mitzi Well's house at 10:00 p.m. When asked the name of the dope man, defendant told the police to "pick any name," and that "they all have street names down there."
The defendant made incriminating statements to witnesses. One witness testified that he overheard defendant on the telephone saying, "We are in some deep stuff. They are trying to blame something on us. We got to talk." Another witness testified that after the shooting, defendant admitted to the witness that he was present at the victim's residence the night of the shooting, saying: "I was there. I ran fast as I could, but I did not do it." The witness testified that the defendant was scared and crying when the statement was made.
The evidence also linked defendant to a weapon. Several witnesses either saw defendant in possession of a .45 caliber handgun or heard defendant talking about owning a .45 caliber handgun before the shooting. Prior to the shooting, a witness offered to buy the gun from defendant but defendant declined, stating he was going to keep it. A week later, defendant told *379 the witness he had sold the gun the day before. The witness told the police that the latter conversation occurred two days after the shooting. The bullet that killed the victim passed through a screen in a door wall of the apartment. Approximately thirty feet from the door wall, and "in a direct line" with where the victim was shot, the police recovered a .45 caliber bullet.
Defendant was in the victim's apartment complex and near the victim's apartment at the time of the shooting. Wells testified that she lived in the apartment complex and was a casual acquaintance of defendant and his wife. She explained that defendant and his wife were infrequent guests, visiting about four times over the past three years. The Warinners were not expected guests on the evening of the shooting. Wells further testified that around 10:00 p.m., defendant's wife came to her home and "asked me if [defendant] and [Wells' boyfriend] had gotten back from the bar, and I said [he] didn't go to no bar with [defendant]." At 10:15 p.m., four minutes after the 911 call was placed, defendant walked in the witness' house and immediately left with his wife. Defendant was in the apartment "[j]ust a couple seconds." Defendant and his wife left the apartment complex in one vehicle. The distance between the victim's residence and Wells' residence was approximately 200-300 yards.
Two witnesses testified that, around the time of the shooting, they observed a man with "funny looking hair," a hat, sunglasses and a moustache. The man "walked in, like he owned it." The victim's girlfriend's son, age four, was the only witness to the shooting. He told police that a man with long curly black hair and a "wooden" cowboy hat walked in right behind the victim as the victim came into the house. The child heard a bang, then saw the victim "with a lot of blood...." Immediately after the shooting, the victim's girlfriend looked out the window and saw the assailant, wearing a wig and a straw hat, running away from the apartment. Another witness told police that "he seen a man, long curly hair running behind his apartment" between 9:45 p.m. and 10:05 p.m.
A search of defendant's house revealed a modeling book that included information "on how to put on wigs, how to change you appearance," a straw brimmed hat, and a gun holster. The police also collected three wigs and a hair piece, including a dark brown curly wig.
The evidence in this case, although circumstantial, was substantial. The Court of Appeals correctly held that any error in excluding this evidence was harmless. We are satisfied that the evidentiary error would not have affected the verdict. People v. Lukity, 460 Mich. 484, 495, 596 N.W.2d 607 (1999).
MARILYN J. KELLY, J., dissents and states as follows:
I would reverse the judgment of the Court of Appeals and vacate defendant's conviction for first-degree murder, on the ground that relevant evidence was improperly excluded at trial.

I
On a September evening in 1994, Russell Harmon was fatally shot in his apartment. The four-year-old son of Harmon's girlfriend witnessed the shooting. He told police that the assailant followed Harmon into the apartment and that Harmon greeted the assailant just before the fatal shot was fired. There is no sign that the shooting was part of a robbery, and no argument or confrontation immediately preceded the assault. The child was unable to identify the assailant.
Suspicion soon centered on defendant, Michael C. Warinner. He and Harmon had argued on several occasions about a set of darts that defendant prized. Defendant believed Harmon had taken the darts. Indeed, Warinner had been heard to say that he was angry enough to kill Harmon.
*380 The testimony regarding defendant's activities on the night of the shooting was inconsistent. Even his own accounts were conflicting. However, it eventually became clear that he had arrived at another apartment in the same complex where Harmon lived, at about the same time the shooting took place.
The child who witnessed the homicide told the police that the perpetrator had long black curly hair and a "wooden" cowboy hat. Harmon's girlfriend, who was upstairs at the time of the shooting, looked from a window immediately afterward and saw a man running down the street. He appeared to have a large amount of black curly hair under a hat.
Two other witnesses reported seeing someone with a black wig and a hat. Still others told police of a long-haired man. When the police went to the defendant's home, they observed several wigs in the bathroom. Although they returned with a warrant and seized the wigs, none matched hair found at Harmon's apartment.
The crime scene offered fresh fingerprints, but they did not match defendant's fingerprints. A bullet was recovered near the scene of the shooting, but no murder weapon was recovered, and the firearms evidence was inconclusive.
Before trial, the court denied a motion to quash. The court denied a midtrial motion for a directed verdict.
When the October 1995 proceedings were complete, the jury found defendant guilty of first-degree murder and possession of a firearm during the commission of the felony. MCL 750.316, 750.227b; MSA 28.548, 28.424(2). The Court of Appeals affirmed.

II

A
This appeal concerns two items of evidence that the circuit court excluded from defendant's trial. I would find that each should have been admitted, and that the circuit court's rulings did not constitute harmless error.

B
On repeated occasions, this Court and the Court of Appeals have stated that a trial court's decision whether to admit evidence is reviewed for an abuse of discretion. People v. Hendrickson, 459 Mich. 229, 235, 586 N.W.2d 906 (1998) (opinion of KELLY, J.); People v. Bahoda, 448 Mich. 261, 288-289, 531 N.W.2d 659 (1995).
An abuse of discretion is often measured by the hyperbolic formulation found in Spalding v. Spalding:[1]
In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.
However, a more carefully measured approach is appropriate for review of an evidentiary determination. The lead opinion in Hendrickson included explanatory language drawn from Detroit Tug & Wrecking Co. v. Wayne Circuit Judge:[2]
[T]he abuse of discretion ought to be so plain that, upon consideration of the facts upon which the court acted, an unprejudiced person can say that there was no justification or excuse for the ruling made.
In the context of an evidentiary ruling, the "facts" that a court acts on include the applicable provisions of the Michigan Rules of Evidence, the proposed evidence, and the other proofs.
Appellate review of an evidentiary issue may entail great deference to the trial court's resolution of the question. It may *381 approach the de novo standard used for questions of law, depending on the nature of the question. For instance, the weighing of probative value versus the danger of unfair prejudice (MRE 403) is normally a judgment call entrusted to the wisdom of the judge. By contrast, the decision whether a statement is hearsay (MRE 801) or whether it fits within a carefully delineated exception (MRE 802-804) can be akin to a question of law.
I quoted above from my Hendrickson opinion, which bears the signatures of three justices. Justice BOYLE's opinion in Hendrickson also garnered three signatures, and her analysis illustrates this point. To determine whether a hearsay statement could be admitted as a presentsense impression, Justice BOYLE examined a variety of legal principles, never suggesting that this was simply a discretionary call. See Hendrickson, supra, at 241-249, 586 N.W.2d 906 (BOYLE, J., concurring).
The present case includes two evidentiary questions involving whether evidence is relevant and whether it should have been admitted. In ruling on these questions, I would treat the issues of relevance as being closer to questions of law. The issues concerning the weighing of probative value and unfair prejudice are questions more fully entrusted to the discretion of the trial court.

III

A
Defendant Warinner was not the only individual with whom Harmon had quarreled in the days preceding the fatal shooting. In fact, the day before he was killed, Harmon had been in a fight at a courthouse with another individual. The court proceedings were the result of an earlier affray involving Harmon and another man at a restaurant. According to defense counsel, the unpleasantness at the courthouse reached the point that the other man threatened to kill Harmon. The next day, someone did.
At his trial, defendant sought to introduce evidence of the fight with the other man and of the threat. The court refused to allow the testimony:
[T]o reach out to third parties and try to establish in this way that they possibly could have been involved in, is getting into an area of hearsay, and more importantly, I think that all of this is not really relevant to the issue that we have to resolve in this case.
In affirming, the Court of Appeals agreed with defendant that the trial court had erred in refusing to admit evidence of Harmon's altercation with another man the day before the shooting. The Court observed that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.
As the Court of Appeals explained, "the evidence was of consequence to a fact in issue in that it went to the issue of whether other people had a motive to kill [the victim], and because the evidence made a fact of consequence less probable in that it was potentially exculpatory to defendant...."

B
I agree with the Court of Appeals that this evidence should have been admitted.
People v. Brooks[3] was a first-degree murder case. The victim lived alone in a farm in rural Washtenaw County. Her body was found in her barn, and various items of property were determined to be missing from her house. When defendant Brooks was arrested in Mississippi, he had the victim's truck and a pawn slip for one of the items taken from her house. He also had half a pound of cocaine, which he said he had taken from her house. His defense was that he was a petty burglar *382 who broke into her house when she was not home. He proposed that she had been killed by some other person, perhaps a cocaine merchant.
To prove that the cocaine came from the victim's home, Brooks sought to introduce testimony that there was cocaine in the deceased's bloodstream at the time of her death. The circuit court rejected this evidence, characterizing it as an attempt at "character assassination." As we explained, however, in the particular circumstances of Brooks, the evidence was an essential brick in the wall that the defendant was attempting to build. Thus, we said:
As noted above, the Court of Appeals said in the present case that "[t]he fact that Kurtz had cocaine in her blood does not make it more probable or less probable that someone other than defendant shot Kurtz." However, the fact that Ms. Kurtz had cocaine in her blood does make it more probable that the defendant was telling the truth when he testified that Ms. Kurtz had a substantial amount of cocaine in her home.
The fact that Ms. Kurtz had cocaine in her bloodstream does not prove that she was killed by a drug dealer, nor does it prove anything else. However, it is a piece of evidence that was relevant to the defense that the defendant sought to present. He argued to the jury that he was a small-time burglar, living outdoors, stealing food and small items that could be converted to cash, taking care to avoid breaking into homes when the occupants were present. It is not our task to determine whether there was any truth the defendant's story. It is only our task to determine whether he was able to present relevant evidence to the jury.
As we stated in People v. VanderVliet, 444 Mich. 52, 75, 508 N.W.2d 114 (1993), "[t]he relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material." On the facts of this case, the disputed evidence was relevant and material, and should have been admitted.
Plainly, this error was not harmless. The prosecution introduced evidence that Ms. Kurtz did not sell drugs, and the prosecutor's rebuttal argument implied to the jury that no corroborative evidence existed to support the defendant's claim that a substantial amount of drugs was present in the home of Ms. Kurtz. The improper exclusion of evidence supporting that important element of the defense theory is error that warrants reversal. [453 Mich. at 519-520, 557 N.W.2d 106.]
Mindful of Brooks, I agree with the Court of Appeals that the evidence of the victim's fight on the day before the shooting was relevant and should have been admitted.

C
Despite finding that the evidence concerning the other individual was improperly excluded, the Court of Appeals affirmed. It said that the error was harmless because "the prosecutor did not present evidence to rebut defendant's theory that another person perpetrated the crime" and "the record is replete with testimony to support defendant's conviction."
Nonconstitutional error that has been preserved, as in this case, should lead to reversal if it is more probable than not that the error was outcome determinative. People v. Lukity, 460 Mich. 484, 596 N.W.2d 607 (1999).
In the present case, such probability is present. While the record does contain some evidence of defendant's guilt, the proofs are far from overwhelming. Persons who apparently saw the shooter near the crime scene could not make an identification, and there is no physical evidence that connects defendant to the killing. If jurors had heard that, the day before the shooting, Harmon had fought with another *383 individual who had threatened to kill him, it might have affected the verdict.
Therefore, it was reversible error to exclude the disputed testimony regarding the relationship and events linking Harmon and the man with whom he had quarreled the day before the shooting.

IV

A
Defendant Warinner also sought at trial to introduce evidence concerning what occurred when a tracking dog was brought to the scene, shortly after the murder. The police arrived at Harmon's apartment soon after the shooting. Among the officers was Todd Koch of the Canton Township Police Department, the handler of a police tracking dog.
In brief testimony delivered outside the presence of the jury, Officer Koch explained that he took his dog by the front door of the apartment. However, scents in the area had been obscured by other officers who had been moving about in the immediate area. The dog began tracking police officers.
Officer Koch explained that, when an area is contaminated with other scents, his practice is to move in circles around the area until the dog locates a human scent.
On that basis, Officer Koch and his dog circled and did find a scent in a nearby wooded area. But the scent "kind of wandered through the woods" without producing anything that appeared helpful.
At trial, defendant sought the introduction of Officer Koch's testimony. He wanted the jury to know that a tracking dog, following human scents away from the vicinity of Harmon's residence, had not picked up a scent that led from the crime scene to the apartment where he was visiting.
The circuit court refused to allow introduction of this evidence:
The cases have recognized that tracking dog evidence has very little, very little evidentiary value. As a matter of fact, the instruction that would be given if the tracking dog evidence was used specifically says that it has very little value as proof.
Now, there are some requirements that are necessary before that type of evidence can be used. And those requirements are basically because the evidence, that type of evidence is not worthy of very much.
It appears here that three of the four requirements would be satisfied very easily. But the third one that requires that it's necessary to show that the dog was placed on the tr[ai]l where circumstances indicate that the culprit was, it doesn't appear to me that has been satisfied. And that's borne out by the testimony that Officer Koch has given about the steps that he took. He's talking about he's talking about human scent, not necessarily the culprit, and this is a very specific requirement. And listening to him, the evidence, if used, would be absolutely meaningless.
I believe under these circumstances the tracking dog evidence will not be allowed.
The trial court's statement regarding the third of four requirements for admissibility is a reference to People v. Laidlaw, 169 Mich.App. 84, 93, 425 N.W.2d 738 (1988). In Laidlaw, the Court of Appeals explained that tracking-dog evidence is admissible on a showing that
(1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it.
The trial court excluded Officer Koch's testimony on the ground that the third of those requirements had not been established. *384 The Court of Appeals affirmed on the same basis.

B
In the decade since Laidlaw was decided, this Court has not had occasion to alter the requirements set forth in that opinion. However, other courts have considered similar questions. A recent example is Brooks v. People,[4] in which the Colorado Supreme Court said:
We adopt the majority rule that other courts considering scent tracking have utilized to determine evidentiary reliability. Therefore, the elements of a proper foundation include: [1] whether the dog is of a breed characterized by acute power of scent; [2] whether the dog has been trained to follow a track by scent; [3] whether the dog was found by experience to be reliable in pursuing human tracks; [4] whether the dog was placed on the trail where the person being tracked was known to have been; and [5] whether the tracking efforts took place within a reasonable time, given the abilities of the animal. See Terrell v. State, 3 Md.App. 340, 239 A.2d 128 (1968) (comprehensive discussion of the history and development of the rule); see also State v. Roscoe, 145 Ariz. 212, 700 P.2d 1312, 1321 (198[4]); Green v. State, 641 So 2d 391 (Fla.1994); State v. Cole [1997 Me. 112], 695 A.2d 1180, 1183 (1997); State v. Brewer, 875 S.W.2d 298 (Tenn.Crim.App.1993). Further, most courts utilizing the majority rule exclude scent tracking evidence as too prejudicial where it is not corroborated by other independent evidence. See State v. Wainwright, 18 Kan.App.2d 449, 856 P.2d 163, 166 (1993); People v. McPherson, 85 Mich.App. 341, 271 N.W.2d 228, 230 (1978); State v. Loucks, 98 Wash.2d 563, 656 P.2d 480, 482 (1983). We adopt this position as well. It is important to note that these foundational considerations are best utilized as a mechanism for conducting a proper CRE 702 and CRE 403 analysis, and not as a substitute for the general philosophy embodied in our rules of evidence. As such, the emphasis a court might wish to afford each of these points might vary depending on the facts of a particular case.
With one exception, the standard formulated in 1999 by the Colorado Supreme Court is the same as the 1988 Laidlaw test. In that regard, the first step of Laidlaw ("the handler was qualified to use the dog") is more satisfactory than the first step of the Colorado Brooks decision ("whether the dog is of a breed characterized by acute power of scent"). The remaining elements are substantially identical.
I would affirm Laidlaw as the test for determining whether testimony concerning the work of a tracking dog is admissible as evidence that the defendant is guilty. While Laidlaw should not be applied mechanically to foreclose consideration of other reasonable factors arising in a particular case, its analysis is a sound approach for issues of this sort.
In the present case, the circuit court concluded that "three of the four requirements would be satisfied very easily." That is so. There is no dispute regarding the qualifications of Officer Koch or the training of his dog. Likewise it is evident that the trail had not grown stale.
The remaining element of Laidlaw is the third, that "the dog was placed on the trail where circumstances indicate the alleged guilty party to have been." Here, too, the requirements of Laidlaw are satisfied. Officer Koch testified that he took the dog by the front door of the apartment, though it became apparent that "he was obviously tracking some police officers" from that point.
Defendant's argument is reminiscent of the Michigan Brooks decision. He views the dog's failure to locate a scent leading *385 to him from the crime scene as one small item of evidence in the full body of proofs. He might acknowledge that the evidence has only slight probative value, but it remains relevant, nonetheless.
With regard to the balance between "probative value" and "the danger of unfair prejudice" outlined in MRE 403, one must be mindful of context. In this instance, the defendant's attempt to introduce testimony akin to Arthur Conan Doyle's "dog who didn't bark" has little potential for unfair prejudice.
Just as I would find that the trial court erred by excluding testimony concerning Harmon's altercation with another person, I would reach a similar conclusion, for similar reasons, on this issue. The trial court improperly excluded a portion of the proofs upon which the defendant sought to demonstrate his innocence.

C
Here, too, it is necessary to consider whether a preserved, nonconstitutional error was harmless. As noted above, the question is whether it is more probable than not that the error was outcome determinative. Lukity, supra.
This was a closely drawn case, where the direct evidence of guilt was limited and defendant offered a plausible alternative theory regarding the homicide. As a consequence, I find it more probable than not that the error affected the verdict. Exclusion of the tracking-dog evidence, alone, given its low probative value, might not be a sufficient basis for reversal. However, reversal is warranted in light of the two errors, considered together.

V
I would reverse the judgments of the Court of Appeals and the trial court, and remand this case to the circuit court for a new trial. MCR 7.302(F)(1).
MICHAEL F. CAVANAGH, J., joins in the statement of MARILYN J. KELLY, J.
NOTES
[1] 355 Mich. 382, 384-385, 94 N.W.2d 810 (1959).
[2] 75 Mich. 360, 361, 42 N.W. 968 (1889).
[3] 453 Mich. 511, 557 N.W.2d 106 (1996).
[4] 975 P.2d 1105, 1114-1115 (Colo., 1999).