*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
January 14, 2021

v

No. 349050
Genesee Circuit Court
LC No. 17-041627-FC

KEITH BERNARD JONES,

        Defendant-Appellant.

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury conviction of armed robbery, MCL 750.529. Defendant raises a number of challenges to the photographic lineup at which the victim identified him as the robber. Defendant also argues that testimony regarding his arrest photograph was irrelevant and unfairly prejudicial. Finding defendant's arguments unpersuasive, we affirm.

## I. BACKGROUND

On May 16, 2017, Rebecca Denton was working at a gas station when a man entered and demanded that she give him all her money. The man threatened to shoot her if she pressed the silent alarm and reached to his side as if grabbing for a gun. Denton gave the man approximately $500 and watched as he drove away in a blue Saturn Vue. Security footage showed that the robbery lasted approximately 30 seconds, during which time the robber stood directly across the counter from Denton. She told police that he was a shorter black male, that his face was uncovered, and that she was "fixated on his face," especially his eyes, which she described as yellowish with one "lazy" or "crooked" eye.[1]

---

[1] Amblyopia, colloquially referred to by some as a "lazy eye," is a medical disorder involving sight. We will refer to the condition by its medical term unless the colloquial term is used in a quotation.

Detective Christopher Weber testified that in his experience, robberies were often committed with stolen cars, so the morning after the robbery, he checked for any cars reported stolen that matched the one in the surveillance video and Denton's description. Detective Weber discovered that a 2004 blue Saturn Vue had been reported stolen, and the vehicle's owner stated that defendant had taken it without permission. Detective Weber then viewed a booking photograph of defendant and discovered that he was a shorter black male with amblyopia who matched Denton's description of the robber.

Police located defendant driving the blue Saturn Vue, arrested him, and read him his *Miranda* rights. Defendant's girlfriend, with whom he had been staying, gave police consent to search her residence, and police seized a pair of red shoes from one of the bedrooms that matched the shoes worn by the robber, as seen on the surveillance video. Police also spoke with witnesses who stated that defendant seemed to be spending a large amount of money in the days following the robbery, and that defendant had told them that he had "hit a lick," which meant that he had committed a robbery.

After his arrest, defendant refused to participate in a corporeal lineup, but Detective Weber informed him that he would still be part of a six-person photographic lineup. Detectives contacted a technician with the Statewide Network of Agency Photos (SNAP) unit to create a six-person photographic lineup for Denton to view. The SNAP technician testified that she received only basic identifying information about defendant. She located his photograph in a database of arrest photographs, and tried to choose other candidates with similar race, sex, eye color, hair color, clothing, and lighting for the remaining photographs in the lineup. The technician also testified that, because defendant appeared to be looking away from the camera in his photograph, she chose other subjects for the lineup who were also looking away from the camera. She commented:

> I wouldn't call it common, but people when they are arrested, they look away from the camera for any number of reasons. It would be speculation on my part, but for example, you could see people who were intoxicated from drugs or alcohol, and you could see people who are just generally uncooperative, or maybe they just blinked well [sic] the photo was being taken. So, it happens. It's not frequent, but it does.

Finally, the technician testified that she was never told that defendant had amblyopia and that she did not notice it in his photograph.

Denton testified that she viewed the photographic lineup "a week or two" after the incident. Detective Weber testified, however, that the lineup occurred "several days" after the robbery, and the presentence investigation report (PSIR) confirmed that the photographic identification occurred on May 19, 2017, three days after the robbery. Detective Weber explained to Denton that the suspect may or may not be included in the six photographs and instructed her to select the photograph that she felt depicted the suspect when she was sure it was him. When Denton viewed the photographic array, she immediately selected defendant's photograph and stated that she was "ninety-eight percent positive" that defendant was the robber. Denton stated that she recognized his face, but stated that "his eyes were the first thing that popped out to [her]" because "his eyes were pretty much burned in [her] head." A felony complaint charging defendant with armed robbery was filed and authorized on May 20, 2017, the day after the photographic lineup.

At defendant's preliminary examination, Denton was the only witness who testified. Denton stated that the robber was a shorter black male with "kind of crooked eyes." Denton agreed that she recognized defendant in the courtroom and stated that she recognized his eyes. Defendant had his eyes down during the proceeding until the judge asked him to hold his head up. Defense counsel confirmed with Denton that she gave a description of a black male with amblyopia, but that only one of the photographs she was shown in the lineup showed an individual with amblyopia. At that point, defense counsel objected to the photographic identification as tainted, arguing that it was highly suggestive that only one of the subjects in the photographs had amblyopia who met the description that Denton gave the officers. Denton confirmed that defendant was the robber, and the district court held that the in-court identification was sufficient to resolve any potential error with the photographic lineup. At the end of Denton's testimony, defense counsel again objected to the identification, arguing that the lineup was tainted and highly suggestive and that Denton's in-court identification flowed from that tainted photographic lineup. The district court disagreed, and found sufficient probable cause to bind defendant over to the circuit court.

Before trial, defendant filed a motion to suppress Denton's identification, arguing that the photographic lineup had been unduly suggestive. The circuit court held an evidentiary hearing on the issue, and the prosecutor argued that the photographic lineup was not unduly suggestive because the witness could independently identify defendant as the robber. Denton testified that she noticed defendant's "crooked" eyes when he robbed the store and stated that he was close enough to her that she could have touched him. When the prosecutor asked what Denton noticed about defendant's physical appearance in the lineup photograph, she stated that "[h]is eyes were the first giveaway," but noted that their misalignment was "[n]ot as bad as when [she saw] him at the store." The prosecutor then asked if there was anything else about the photograph that helped her make an identification, and Denton stated: "When I seen the picture, it—his face came back in my . . . head. I—I knew it was him right away." She agreed that she looked at all the photographs, but when she saw defendant's, "his face popped back up in my head" and she recognized him. Denton agreed that she identified defendant in district court not because he was wearing a prison jumpsuit and was seated next to the defense attorney, but because "[h]e just stuck out to me. His face and everything; it's like burned in my head." She stated that defendant would not look at her in court, so she could not identify him by the alignment of his eyes, but she was able to identify him anyway. Denton repeatedly confirmed to the prosecutor that her identification was not solely based on defendant's eyes:

> *Q.* Do you believe that, but for looking at the photographs shown to you by the detectives, that you would be unable to identify the person that robbed you?
>
> *A.* No, I could have identified him if—if he was never caught and I was walking on the street and I seen him, I would have been able to identify him.
>
> *Q.* Okay. And this—is this only with reference to the alignment of his eyes?
>
> *A.* Well his eyes are what caught me at first.
>
> *Q.* Okay.

*A.* That's the one thing I could tell the cops is what caught my eye.

*Q.* All right, but that wasn't the sole basis of your identification?

*A.* No.

Defense counsel argued that because the photographic lineup did not include any other individuals who had defendant's distinctive amblyopia, the lineup was unduly suggestive, and because Denton saw defendant repeatedly after she saw the photograph, there was no way to rectify the tainted first identification. The circuit court disagreed, finding that in the totality of the circumstances, although defendant's eye was a distinctive feature, it was not the only aspect that caused Denton to identify defendant. The circuit court noted that the other photographs featured individuals of a similar age, race, haircut, and clothing to defendant, and that Denton had been able to observe the facial features of defendant during the robbery, so the photographic lineup was not unduly suggestive. The circuit court also observed that requiring the photographic lineup to include another individual with amblyopia would have been difficult:

> I would also say that I don't know how the officers would have located other individuals who have a lazy eye such as this particular Defendant. I'm not sure how they would go about that; and I don't think it would be appropriate for the Court to suggest that, in order to render due process that the officers would have to go out and find individuals who not only matched the alleged Defendant in terms of age, approximate height, skin complexion, facial hair, but also—who have a lazy eye. I don't know how many people in the population fit into that category, but I don't think there's very many people who fall into that category; and I think to require the police to ident—to go out and find individuals I think is asking more than probably would be required under the law.

The circuit court therefore denied defendant's motion to suppress the in-court identification of defendant as the robber.

At trial, the witnesses testified as described above. Defense counsel emphasized in both her opening and closing statements that the photographic lineup was a tainted identification. Ultimately, the jury convicted defendant of armed robbery.

After trial, with the assistance of appellate counsel, defendant filed a motion for a new trial or evidentiary hearing. In that motion, defendant argued that his trial counsel was ineffective for failing to object to the photographic lineup on the grounds that it occurred after defendant was in custody, after defendant had been charged with the robbery, and without the presence of counsel. This was the first time that defendant raised the argument that the photographic lineup had occurred after he had been charged with the robbery. The trial court denied the motion, holding that, even though defendant was in custody, he was not entitled to counsel because he had not been charged with the robbery when the photographic lineup occurred.

The trial court ultimately sentenced defendant, as a third-offense habitual offender, MCL 769.11, to serve 121 months to 30 years in prison. This appeal followed.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that his trial counsel was ineffective because he failed to object to the photographic-identification procedure on the grounds that it occurred after the commencement of criminal charges, while defendant was in custody, and without the presence of his counsel. Defendant moved for a new trial or evidentiary hearing on this claim. After considering the matter, the trial court held that defense counsel was not ineffective, and denied the motion. Accordingly, defendant has preserved the claim for appellate review.

Defendant bears the burden to prove that his trial counsel did not provide effective assistance. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). To determine whether counsel was ineffective, this Court relies on the test set out in *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

> First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. In doing so, the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy. Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable. [*People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011) (citations omitted).]

Claims of ineffective assistance of counsel are mixed questions of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review de novo questions of law and review for clear error findings of fact. *Id.* We review for abuse of discretion a trial court's decision to grant or deny a motion for a new trial. *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003). "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (cleaned up).

Defendant argues that conducting a photographic lineup without providing him counsel was a structural error.[2] In *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993), the Michigan Supreme Court held that "counsel is not required at precustodial, investigatory photographic lineups" because "[i]n the case of photographic identifications, the right of counsel attaches with custody." The Court subsequently clarified, however, that "the right to counsel attaches only at or after the initiation of adversarial judicial proceedings." *People v Hickman,* 470 Mich 602, 607; 684 NW2d 267 (2004). As this Court recognized in *People v Perry*, 317 Mich App 589, 598; 895 NW2d 216 (2016), the rule in *Hickman* applies to *Kurylczyk*, and a suspect

---

[2] "A structural error is a fundamental constitutional error that defies analysis by harmless error standards." *People v Miller*, 482 Mich 540, 556; 759 NW2d 850 (2008) (cleaned up). A structural error "necessarily renders unfair or unreliable the determining of guilt or innocence." *People v Duncan,* 462 Mich 47, 51; 610 NW2d 551 (2000). Therefore, structural errors "are intrinsically harmful, without regard to their effect on the outcome, so as to require automatic reversal." *Id.*

does not have a right to have counsel present at a photographic lineup that occurs before criminal proceedings have been initiated.

In this case, there is no question that defendant was in custody when the photographic lineup occurred. On appeal, however, the parties dispute whether the lineup occurred before or after defendant was charged with the armed robbery in this case. Defendant points to Denton's testimony that she viewed the photographic array "a few weeks" or "a week or two" after the incident. We note that Denton's testimony on this issue is far from dispositive because she demonstrated that her estimations regarding the passage of time were inaccurate. Most tellingly, she testified that the robbery took 10 to 15 minutes, but the surveillance video showed that the entire robbery took approximately 30 seconds.

In contrast to Denton's testimony, the detective testified that the photographic lineup occurred "several days" after the robbery, and the PSIR states that the photographic lineup occurred on May 19, 2017, only three days after the robbery and the day before the prosecutor charged defendant with the robbery. Defendant offers no argument that the date contained in the PSIR is incorrect.[3] Because the PSIR indicated that the photographic lineup occurred before the initiation of adversarial judicial criminal proceedings against defendant, he was not entitled to counsel at that time and no structural error could have occurred. Furthermore, because defendant was not entitled to counsel at a photographic lineup that occurred before he was charged with the armed robbery, any objection by counsel on these grounds would have ultimately been futile. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Defendant has not established that his counsel was ineffective.

## B. UNDULY SUGGESTIVE IDENTIFICATION

Defendant next argues that he was denied a fair trial because the photographic lineup was unduly suggestive. Defendant filed a pretrial motion to suppress the identification, arguing that the lineup was unduly suggestive because defendant was the only subject in the lineup who had amblyopia. We review de novo a trial court's ruling on a motion to suppress evidence, reviewing for clear error the trial court's factual findings and reviewing de novo the underlying constitutional issues. *People v Henry (After Remand)*, 305 Mich App 127, 137; 854 NW2d 114 (2014). Clear error occurs when we are "left with a definite and firm conviction that a mistake was made." *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013).

"A defendant's right to due process is implicated if an in-court identification was preceded by a suggestive out-of-court identification." *People v Posey*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket Nos. 345491; 351834); slip op at 3, citing *Neil v Biggers*, 409 US 188, 196-198; 93 S Ct 375; 34 L Ed 2d 401 (1972). "If the trial court finds that the pretrial procedure was impermissibly suggestive, testimony concerning that identification is inadmissible at trial." *Kurylczyk*, 443 Mich at 303. To sustain a due-process challenge, however, a defendant must show

---

[3] The prosecutor also points this Court to the arrest report, which similarly states that the photographic lineup occurred on May 19, 2017.

that the pretrial-identification procedure was "so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *Id.* at 302-303. When examining the totality of the circumstances, courts look at several factors, including

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. [*Id.* at 306 (cleaned up).]

Not every factor will be relevant in every case, so "a court may put greater or lesser weight on any of the listed factors, depending on the circumstances of the case." *People v Gray*, 457 Mich 107, 117 n 12; 577 NW2d 92 (1998). For example, a suggestive identification procedure can occur when a witness is told that police have arrested the right person, when a witness is shown only one person's photograph, or when a witness is shown a group of individuals in which one person—the defendant—is uniquely singled out in some way. *Posey*, ___ Mich App at ___; slip op at 3, citing *Gray*, 457 Mich at 111. The Michigan Supreme Court has recognized generally, however, that a "photo spread is not suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features and thus sufficient to reasonably test the identification." *Kurylczyk*, 443 Mich at 304 (cleaned up). "Thus, differences in the composition of photographs, the physical characteristics of the individuals photographed, or in the clothing worn by a defendant and the others pictured in a photographic lineup have been found not to render a lineup impermissibly suggestive." *Id.* (citations omitted).

Assuming without deciding that the photographic lineup in this case was somewhat suggestive because of defendant's amblyopia, we nonetheless conclude that there was no substantial likelihood of misidentification under the *Kurylczyk* factors. The Michigan Supreme Court has stated: "[A] suggestive lineup is not necessarily a constitutionally defective one. Rather, a suggestive lineup is improper only if under the totality of the circumstances there is a substantial likelihood of misidentification." *Kurylczyk*, 443 Mich at 306. In this case, the totality of the circumstances indicated that Denton was able to identify defendant regardless of any suggestiveness in the photographic lineup. Denton had the opportunity to view the robber's entire face as he stood just across the counter from her during the robbery; she conversed with him during the robbery, and stated that his face was "burned in her head," which indicated that she was paying attention; she consistently gave an accurate description of the robber that matched defendant; she stated that she was "ninety-eight percent positive" that defendant was the man who robbed her when she viewed the photographic lineup; and she made the identification a few days after the robbery, which indicated that her identification was accurate.[4] Overall, given the totality of the circumstances, the photographic lineup in this case was not so unduly suggestive that it denied defendant due process. And, because " '[t]he need to establish an independent basis for an in-court identification *only arises* where the pretrial identification is tainted by improper procedure or unduly suggestive comments,' " *Posey*, ___ Mich App at ___; slip op at 4, quoting *People v*

---

[4] In *Kurylczyk*, 443 Mich at 307, the Michigan Supreme Court noted that "delays as long as eighteen months after a crime do not invalidate an eyewitness identification."

*Laidlaw*, 169 Mich App 84, 92; 425 NW2d 738 (1988), we need not address whether there was an independent basis for identification.

## C.  UNFAIR PREJUDICE

Finally, defendant argues that he was denied a fair trial because testimony regarding his arrest photograph was irrelevant and unfairly prejudicial. We review for abuse of discretion a trial court's determination of evidentiary issues. *People v Adair*, 452 Mich 473, 485; 550 NW2d 505 (1996). An abuse of discretion occurs when the trial court "chooses an outcome that falls outside the range of principled outcomes." *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013). We review de novo preliminary questions of law regarding whether a statute or evidentiary rule applies, or whether constitutional protections require exclusion of evidence. *People v Duenaz*, 306 Mich App 85, 98; 854 NW2d 531 (2014).

In this case, the SNAP technician testified at trial that she used an arrest photograph of defendant to create the photographic lineup. We conclude that the testimony was relevant to explain the technician's method of creating the photographic lineup. MRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In this case, the technician's method of selecting photographs was of consequence to the determination of the action because defendant directly challenged the objectiveness of the lineup when he argued that it was unduly suggestive. To combat this argument, the technician necessarily had to explain her method of choosing the photographs in her effort to ensure that the lineup was as neutral as possible. The technician explained that she used booking photos from the same jail to ensure that the photos had similar lighting and that all the subjects were wearing similar clothing. Her testimony that she used defendant's booking photo allowed her to explain why she chose other booking photos to create a neutral selection. Therefore, her testimony was relevant to the determination of the action.

There is no indication that the technician's testimony was unduly prejudicial. The Michigan Supreme Court has stated that introducing evidence of a defendant's other bad acts or crimes creates a severe risk "that the juror will use the evidence precisely for the purpose that it may not be considered, that is, as suggesting that the defendant is a bad person, a convicted criminal, and that if he did it before he probably did it again." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). In this case, however, there is no indication that the jury ever learned that defendant had been previously arrested or convicted of a crime. No evidence of any previous arrest or conviction was presented to the jury. The jury may have assumed that the arrest photo came from the robbery charges for which defendant was being tried, because detectives testified that defendant was arrested as a suspect for the robbery and the technician testified that she preferred to use the most recent photo of a suspect when creating the lineup. Further, the

photographic lineup was entered into evidence, so the jury could plainly see that defendant's photograph was likely a booking photo. The technician also mentioned only once that she used a prior booking photograph of defendant. Although the trial court instructed her not to emphasize defendant's arrest, it also instructed that she was free to discuss her method of selecting the photographs. Overall, defendant has not shown that the technician's testimony caused him undue prejudice because the jury would have known that he had been arrested, even without the technician's testimony.

Defendant also argues that, when the technician discussed the fact that he was looking away from the camera in his booking photograph, she improperly implied to the jury that defendant was a criminal who demonstrated consciousness of guilt. To the contrary, the technician's comment never implied that defendant had any consciousness of guilt. The technician merely speculated that defendant may have looked away from the camera for any number of reasons. Moreover, the reference was fleeting and the prosecutor did not dwell on it. Therefore, defendant has not shown that the technician's testimony caused any undue prejudice.

Affirmed.

/s/ Brock A. Swartzle
/s/ Amy Ronayne Krause
/s/ Michelle M. Rick