*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MARCUS LEONARD PALMER,

Defendant-Appellant.

UNPUBLISHED
November 26, 2019

No. 345188
Washtenaw Circuit Court
LC No. 17-000228-FC

Before: BORRELLO, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Defendant was convicted following a jury trial of one count of second-degree murder, MCL 750.317; and one count of carrying a firearm during a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to 2 years' imprisonment for his felony-firearm conviction and 28 to 50 years' imprisonment for his murder conviction, with the felony-firearm sentence to be served preceding and consecutively to the murder sentence. The trial court departed upward in imposing defendant's murder sentence. Defendant now appeals as of right. For the reasons set forth in this opinion, we affirm defendant's conviction, vacate defendant's sentence, and remand for resentencing.

## I. PERTINENT BACKGROUND

During the late night hours of July 23, 2016, or very early morning hours of July 24, 2016, the victim went to see his girlfriend, Kalynne Leclair,[1] at her home. At some point during the very early morning hours of July 24, 2016, the victim left Leclair's house. He was discovered the next morning, lying on the ground outside Leclair's house and near the road. The victim was already deceased by this time, having been shot three times.

---

[1] Leclair's name also appears in the record as "LeClair." We are unsure which version is correct, but we will use "Leclair" throughout this opinion for the sake of consistency.

Defendant was subsequently connected to the homicide through other evidence not relevant to the issues raised on appeal.[2] He was charged with open murder and felony-firearm. At trial, the jury found defendant not guilty of first-degree murder, but convicted defendant of second-degree murder and felony-firearm. This appeal ensued.

## II. IN-COURT IDENTIFICATION TESTIMONY

On appeal, defendant first argues that the trial court erred by denying defendant's pretrial motion to suppress Leclair's in-court identification testimony.

### A. STANDARD OF REVIEW

"On review, the trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous." *People v Kurylczyk*, 443 Mich 289, 303; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.), overruled in part on other grounds by *People v Hickman*, 470 Mich 602, 603-604; 684 NW2d 267 (2004), as stated in *People v Perry*, 317 Mich App 589, 598; NW2d 216 (2016); see also *Kurylczyk*, 443 Mich at 318 (opinion by BOYLE, J.) (concurring in relevant part). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *Kurylczyk*, 443 Mich at 303 (opinion by GRIFFIN, J.); see also *Kurylczyk*, 443 Mich at 318 (opinion by BOYLE, J.). Questions of law related to a motion to suppress identification testimony are reviewed de novo. *Hickman*, 470 Mich at 604-605.

### B. FACTUAL AND PROCEDURAL BACKGROUND

During Leclair's testimony at defendant's preliminary examination in March 2017, Leclair made an in-court identification of defendant and testified that the victim was communicating with defendant through a video messaging application on the victim's cell phone on the night of the murder. Leclair testified that she was able to see defendant's face on the screen of the victim's cell phone. Leclair also testified that she had not seen defendant before that night and did not know who he was at that time. Leclair admitted that she had been drinking alcohol and smoking marijuana that night. She indicated that she recognized defendant after seeing him in court beginning in November 2016 and that she was able to identify him based on his face, eyes, beard, mustache, and voice. Leclair testified that she heard defendant state his name "every time" she came to court and that she remembered defendant's voice because it was "unique" and "very deep." According to Leclair, she thought she had heard defendant state his name two or three times by the time she identified defendant to police.

Prior to trial, defendant moved to suppress any identification by Leclair of defendant. In his motion, defendant argued that Leclair was only able to identify defendant after he was charged with murder and seeing him at several court hearings.

---

[2] To the extent additional record evidence is pertinent to defendant's appellate arguments, it will be discussed as necessary in the context of our analysis below.

The trial court held an evidentiary hearing at which Leclair testified. Leclair stated that the police never asked her to participate in any photographic or corporeal line-up. Discussing the night of the murder, Leclair testified that she was sitting with the victim on her bed while he was using his cell phone, that she was within "an arm's length" of the cell phone screen, and that she was able to observe the face of the person with whom the victim was communicating for approximately two or three minutes.[3] On the morning after the murder, Leclair told police that the victim had been talking to someone named "Markeyo," but she testified that she had been "in shock" at the time and confused because the victim was also talking to someone named "Mario" that night. Leclair further testified that other than seeing defendant on the victim's cell phone screen in July 2016, she had never seen him prior to seeing him at a court proceeding in November or December of the same year. However, she acknowledged that she had seen a picture showing defendant from a distance in a Facebook post by the victim's mother. When she saw the post, Leclair thought defendant "looked familiar and that the name sounded definitely right." Leclair testified that she recognized defendant in court by the way he looked and from his voice.

On cross-examination, defense counsel asked Leclair when she first recognized defendant as the person with whom the victim was communicating by video on the night of the murder, and Leclair responded that she thought she saw the Facebook post by the victim's mother at some point in November before defendant's first court date. Leclair testified in more detail on cross-examination about observing defendant in court for the first time and recognizing him as the person who had been communicating with the victim that night. Leclair testified that defendant "came in" and "said his name." Leclair continued, "I looked at him the whole time and I tried to make sure that that was—that was the person that I seen and I looked at his face and I knew it was." She testified that she recognized the "shape" of defendant's eyes, which she described as "kind of like oval . . . like wide and low." Leclair indicated that defendant was wearing prison garb and was shackled during this hearing. But she explicitly testified that she did not identify him on the basis that he was already the defendant in the case. The first time that she testified under oath regarding her identification of defendant was at the preliminary examination in March. Leclair also admitted at the evidentiary hearing that she was not absolutely certain about her identification of defendant and that the beard she had previously claimed to have seen could have been a shadow.

The trial court denied the motion to suppress, reasoning that the prosecution had demonstrated that Leclair had an independent basis for the identification and that her identification of defendant was sufficiently reliable to be submitted to a jury.

C. ANALYSIS

---

[3] Leclair acknowledged on cross-examination that she was not concentrating solely on defendant's face during this time but also was looking at defendant's background surroundings. She believed that defendant was riding in a car as he was talking to the victim.

Defendant cites *People v Kachar*, 400 Mich 78, 90-92; 252 NW2d 807 (1977), for the general proposition that a conviction may be challenged on the basis that an impermissibly suggestive identification procedure was used. Defendant argues that Leclair's in-court identification of defendant was inadmissible because there was not sufficient evidence that Leclair had an independent basis for her identification.

A defendant's right to due process may be violated if, under the totality of the circumstances, a pretrial identification procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall v Denno*, 388 US 293, 301-302; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), abrogated on other grounds by *Griffith v Kentucky*, 479 US 314, 326; 107 S Ct 708; 93 L Ed 2d 649 (1987); see also *Kurylczyk*, 443 Mich at 302 (opinion by GRIFFIN, J.) ("In order to sustain a due process challenge, a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification."); *Kurylczyk*, 443 Mich at 318 (opinion by BOYLE, J.) (concurring in relevant part).

Testimony concerning an impermissibly suggestive pretrial identification procedure is not admissible at trial, but "in-court identification by the same witness still may be allowed if an independent basis for in-court identification can be established that is untainted by the suggestive pretrial procedure." *Kurylczyk*, 443 Mich at 303 (opinion by GRIFFIN, J.); *id*. at 318 (opinion by BOYLE, J.); see also *United States v Wade*, 388 US 218, 239-242; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) (holding that the "proper test" to be applied when an illegal pretrial identification procedure has been conducted is to determine whether "the in-court identifications had an independent source," i.e., "[w]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint") (quotation marks and citation omitted); *Gilbert v California*, 388 US 263, 272; 87 S Ct 1951; 18 L Ed 2d 1178 (1967) ("The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error.").

However, "[t]he need to establish an independent basis for an in-court identification only arises where the pretrial identification is tainted by improper procedure or unduly suggestive comments." *People v Laidlaw*, 169 Mich App 84, 92; 425 NW2d 738 (1988); see also *People v Barclay*, 208 Mich App 670, 675-676; 528 NW2d 842 (1995). As the United States Supreme Court has more fully explained, improper state action is a required threshold component of a due process claim premised on an allegedly suggestive pretrial identification procedure:

> In our system of justice, fair trial for persons charged with criminal offenses is secured by the Sixth Amendment, which guarantees to defendants the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution. Those safeguards apart, admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine. This Court has recognized, in addition, a due process check on the admission of eyewitness identification, applicable when the police have arranged

-4-

suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime.

> An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt. [*Perry v New Hampshire*, 565 US 228, 231-233; 132 S Ct 716; 181 L Ed 2d 694 (2012) (citation omitted).]

In *Perry*, a police officer was inside an apartment building, talking to a woman who had just witnessed a man breaking into cars in the parking lot of the apartment building. *Id*. at 233-234. During this conversation, the woman spontaneously identified a man standing next to another police officer in the parking lot as the culprit. *Id*. at 234. The *Perry* Court held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id*. at 248. In reaching its holding, the Court stated that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id*. at 238-239. The Court further reasoned that the reliability of evidence is traditionally determined by the jury rather than the judge and that "[t]he fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id*. at 245.

Here, defendant seemingly argues that the mere holding of a defendant's pretrial hearing constitutes improper state action where, as occurred in this case, a person who is to be a witness at the defendant's trial spontaneously recognizes the defendant and reports to law enforcement that she can identify the defendant, *Perry*, 565 US at 232-233, 248. However, such circumstances do not implicate concerns that law enforcement "rigged" an identification procedure. *Id*. at 232-233. Because there was no improper or unnecessarily suggestive identification procedure involved, there is no need to assess the reliability of Leclair's

identification or whether she had an independent basis for the in-court identification. *Id*. at 232-233, 248; *Laidlaw*, 169 Mich App at 92; *Barclay*, 208 Mich App at 675-676. In sum, there was no evidence of improper law enforcement activity or state action related to Leclair's identification of defendant. Hence, the trial court did not clearly err by permitting Leclair's in-court identification of defendant at trial.[4]

## II. PROPORTIONALITY OF DEFENDANT'S SENTENCE

Next, defendant argues that his sentence is unreasonable because it violates the principle of proportionality. Defendant specifically argues that the trial court sentenced him to a minimum sentence that was above the guidelines range because the trial court believed that defendant should have been convicted of first-degree murder rather than second-degree murder.

## A. STANDARD OF REVIEW

Defendant's minimum sentence of 28 years' imprisonment for his second-degree murder conviction represented an upward departure from his guidelines range of 162 to 270 months. This Court reviews departure sentences for reasonableness by determining whether the trial court abused its discretion, which is assessed by assessing whether the trial court violated the principle of proportionality as stated in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). *People v Steanhouse*, 500 Mich 453, 477; 902 NW2d 327 (2017).

## B. FACTUAL AND PROCEDURAL BACKGROUND

At sentencing, the trial court explained its rationale for defendant's second-degree murder sentence as follows:

> I do understand that the jury did not convict [defendant] of first degree murder; however, there was testimony that showed conduct that was cold and calculated with no consideration or concern for the result of the Defendant's actions, either before or after the shooting. I do understand that the sentencing

---

[4] We additionally note that defense counsel thoroughly and vigorously cross-examined Leclair regarding her identification and brought forth reasons to doubt the credibility of her identification. The *Perry* Court recognized that other rights protected by the Sixth Amendment, including the right to the effective assistance of counsel and the right to confront witnesses, help protect defendants from "eyewitness testimony of questionable reliability" receiving undue weight. *Perry*, 565 US at 245-247. The jury in this case convicted defendant of second-degree murder and felony firearm. It was within the province of the jury to evaluate the credibility of Leclair's identification and the weight to ascribe to it. *Id*. at 245; see also *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000) ("The credibility of identification testimony is a question for the trier of fact that we do not resolve anew."). Furthermore, the prosecution minimized the importance of Leclair's identification testimony in closing argument by not relying on it in explaining its theory of the case and by stating during rebuttal argument that Leclair may have been mistaken.

guidelines aren't mandatory but they do need to be considered and appropriately scored and I believe that's been done here. I do not believe that the guideline range of 162 to 270 months would ref—on the minimum would reflect a just and fair sentence considering how callous and deliberate Defendant's conduct was. He tried to get another individual to drive him to [the victim], that didn't work. So he got someone else to text the decedent to get him to come out of a location where he felt safe and where he could confront him. He took his girlfriend's car and went armed with a gun from Romulus to Augusta Township and after shooting [the victim] the Defendant left him to die after shooting him multiple times. Afterwards when [the victim's] name was brought up he grinned. On another occasion Defendant described what he did and that description revealed movement by the victim which means that he possibly survived for some amount of time. Later he then said that he wanted Jorge[5] to know about what he did, apparently to acquire favor. This was, as [the victim's father] said, an ambush and as [the victim's mother] said, this was over something that didn't even involve [defendant].

The guideline sentencing grid does not sufficiently reflect the Defendant's actions. He is scored for offense variables at 136 points, 36 points over the minimum for that guideline cell, or 36 percent over and it should be noted that there is no level four on this grid. It tops out at level three. His conduct was heartless and reprehensible and a minimum sentence in accordance with the guidelines does not appear to be proportionate to the Defendant's conduct; however, the ref—recommendation of the Michigan Department of Corrections appears to be somewhat more in line with a fair and just sentence; their recommendation of 30 to 50 years. That would be designed to appropriately punish the Defendant, defer [sic] criminal behavior, and protect the community; however, I don't believe that that recommendation would sufficiently reflect the Defendant's lack of any prior criminal convictions.

As previously stated, the trial court imposed a sentence of 28 to 50 years' imprisonment for defendant's second-degree murder conviction.

### C. ANALYSIS

Our Supreme Court has recently held that "[o]nce acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime." *People v Beck*, ___ Mich ___, ___; ___ NW2d ___ (2019) (Docket No. 152934); slip op at 2.

In this case, defendant was charged with open murder, and the jury was instructed on both first-degree premeditated murder and second-degree murder. The record reflects that the jury, in announcing its verdict, expressly found defendant not guilty of first-degree premeditated

---

[5] There was testimony that the victim had "some kind of beef with Jorge."

murder and guilty of second-degree murder. Clearly, the jury acquitted defendant of first-degree murder. See *Green v United States*, 355 US 184, 189-191; 78 S Ct 221; 2 L Ed 2d 199 (1957) (holding that the defendant could not constitutionally be retried for first-degree murder after his second-degree murder conviction had been reversed because the jury in his first trial was authorized to find him guilty of either first-degree or second-degree murder and found him guilty of second-degree murder, which the Supreme Court reasoned should "be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty of murder in the first degree but guilty of murder in the second degree' ").[6]

Although the trial court in this case acknowledged that the jury had not convicted defendant of first-degree murder, the language the court used to justify its departure from the guidelines nonetheless indicated that it believed defendant planned the murder and thereby acted with premeditation. See *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (stating that although the meaning of premeditation is not defined in the statute, the term has been recognized as meaning "to think about beforehand") (quotation marks and citation omitted). As pertains to the nature of the charges in this case, "[i]t is well established that 'second-degree murder is first-degree murder *minus* premeditation,' " *People v Blevins*, 314 Mich App 339, 358; 886 NW2d 456 (2016) (citation omitted), and premeditation thus constituted the essential distinguishing element. See also MCL 750.316(1)(a) (stating that "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing" is first-degree murder); MCL 750.317 ("All other kinds of murder shall be murder of the second degree . . . .");[7] *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998) ("The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. The malice element for depraved heart murder is general mens rea.") (citations omitted).

As the *Beck* Court stated, "when a jury has specifically determined that the prosecution has not proven beyond a reasonable doubt that a defendant engaged in certain conduct, the defendant continues to be presumed innocent. 'To allow the trial court to use at sentencing an essential element of a greater offense as an aggravating factor, when the presumption of innocence was not, at trial, overcome as to this element, is fundamentally inconsistent with the presumption of innocence itself.' " *Beck*, ___ Mich at ___; slip op at 18-19 (citation omitted). Because of the trial court's improper reliance on acquitted conduct in imposing an upward departure sentence, defendant's due process rights were violated, and we therefore vacate

---

[6] We note that the *Beck* Court's holding was grounded on due process, not double-jeopardy, concerns, *Beck*, ___ Mich at ___; slip op at 16-17, 21-22, but we find the United States Supreme Court's double jeopardy jurisprudence instructive with respect to the issue of a defendant's acquittal of charged conduct.

[7] MCL 750.316(1) also contains additional definitions of offenses designated as first-degree murder.

defendant's sentence and remand this matter to the trial court for resentencing. See *id*. at ___; slip op at 21-22 ("Because the sentencing court punished the defendant more severely on the basis of the judge's finding by a preponderance of the evidence that the defendant committed the murder of which the jury had acquitted him, it violated the defendant's due-process protections.").

## IV. RESTITUTION

Next, defendant argues that he "was ordered to pay $14,024.70 restitution without verification or documentation presented on the record" and that he "was not allowed to contest the amount of restitution ordered and there is nothing on the record to support the amount of restitution ordered by the Court." However, the record belies defendant's claim. The sentencing transcript indicates that at the hearing, the attorneys and trial court discussed the amount of restitution that the prosecution was requesting—$14,024.70—and the documentation provided by the prosecution. Both the discussion at sentencing and presentence investigation report indicated that the restitution being sought was based on funeral and burial expenses.[8] After reviewing a document provided by the prosecution, defense counsel stated that "we would have no objection to the amounts contained therein at this time."

Hence, contrary to defendant's appellate argument, defendant had an opportunity to contest the amount of restitution but instead approved of the amount of restitution. "Waiver has been defined as the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Id*. (quotation marks and citation omitted). Specifically approving the trial court's actions constitutes a waiver. *Id*. at 215, 220.

In this case, by approving the amount of restitution at the sentencing hearing, defendant waived appellate review of this issue. It is evident from the record that defense counsel expressed unequivocal approval of the restitution amount. There is no meaningful difference between counsel stating, "I approve," and stating that "we would have no objection to the amounts." See *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011) (concluding that an attempt to differentiate "between counsel stating, 'I approve of the instructions,' and counsel stating, 'I have no objections,' [was] unavailing").

---

[8] MCL 780.766(4) provides in pertinent part as follows:

> (4) If a crime results in physical or psychological injury to a victim, the order of restitution shall require that the defendant do 1 or more of the following, as applicable:

> \* \* \*

> (f) Pay an amount equal to the cost of actual funeral and related services.

## V.  COURT COSTS

Defendant also argues on appeal that the trial court abused its discretion by ordering him to pay $1,611 in court costs without articulating on the record its reasoning for imposing those costs.  Defendant did not object to the imposition of costs, so our review of this issue is for plain error.  *People v Konopka (On Remand)*, 309 Mich App 345, 356; 869 NW2d 651 (2015).  A trial court possesses statutory authority under MCL 769.1k to order a defendant to pay court costs, but those costs must be "reasonably related to the actual costs incurred by the trial court."  *Id*. at 350-351, 359-360.  The costs do not need to be separately calculated for each case, but the trial court must establish a factual basis for the costs imposed.  *Id*. at 359.  A factual basis is necessary to permit appellate review of the reasonableness of the costs, and the failure to establish a factual basis in the trial court requires us to remand for that purpose.  *Id*. at 359-360.

As an initial matter, defendant's appellate argument mischaracterizes what occurred in the trial court.  Defendant argues that the "trial court cannot arbitrarily impose excessive costs unrelated to the case and which are manifestly unjust" and that "[m]inimal due process requirements entitle defendant to an opportunity to be heard regarding the amount of court costs imposed and the factors or method involved in calculating those costs."  Contrary to these arguments, the record reflects that the trial court did not act in an inherently arbitrary manner, that defendant was informed of the factors and method involved in calculating the court costs imposed, and that defendant had an opportunity to be heard on these matters but remained silent.  The sentencing transcript indicates that defendant received a form showing how the court costs imposed had been calculated.  Defendant did not object to the amount of costs imposed or the manner of informing him how those costs had been imposed.

However, defendant is correct on appeal to the extent that he maintains that the trial court's method of calculating these costs was not articulated on the record and that the trial court's form is not a part of the lower court file.  Thus, there is nothing in the record from which we may review whether a reasonable relationship exists between the costs imposed and the court's actual costs.  *Konopka*, 309 Mich App at 359-360.

Accordingly, on remand for resentencing, the trial court shall also make the information regarding the calculation of the imposed costs part of the record so as to make a complete record of the factual basis for the court costs imposed and to facilitate appellate review.[9]

Affirmed in part, vacated in part, and remanded for resentencing.  We do not retain

---

[9] We note that the prosecution has included a purported copy of this form in its appellate brief.  However, it is improper to expand the record on appeal.  *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499 (1999).  Moreover, the prosecution has not made any motion attempting to properly make this form part of the record.  We thus decline to consider this material that is not properly before this Court.

jurisdiction.

/s/ Stephen L. Borrello
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto