*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERTO MARCELLO DUPREE,

        Defendant-Appellant.

UNPUBLISHED
February 6, 2020

No. 344603
Macomb Circuit Court
LC No. 2015-003884-FC

Before: BECKERING, P.J., and CAVANAGH and STEPHENS, JJ.

PER CURIAM.

A jury convicted defendant, Roberto Marcello Dupree, of armed robbery, MCL 750.529. The trial court sentenced him as a fourth-offense habitual offender, MCL 769.12, to 30 to 60 years in prison. Defendant appeals as of right his conviction and raises several errors in the calculation of his sentence. Finding no error requiring reversal, we affirm.

## I. RELEVANT FACTS

Defendant was arrested and charged for his participation in the armed robbery of a Smoker's Only store located in Clinton Township. The victim stated that he was working alone at a smoker's store in the morning of December 15, 2012, when a man approached him, drew a gun, pointed it at his face, and told him not to move. He said that he raised his hands, and two other men approached, bound him with duct tape, and moved him to the back of the store. The men unsuccessfully attempted to leave through a back door, and one of the men struck the victim's head with the gun. After the men left through the front door, the victim was able to free himself and call the police, and a neighboring store worker told him that she saw men walk behind the end store of the strip mall. He said that the men took all the cash from the register and some cigars.

The incident was recorded on surveillance video. Clinton Township Police Sergeant Deena Terzo viewed the surveillance video at the time of the crime and testified that the man with the gun was a thin African-American male, who appeared to be in his late 20s, who was not wearing a glove or mask. Terzo described the other robbers as a heavyset light-skinned man with a shaved head wearing clear or yellow rubber gloves, and a medium-built African-American male wearing one white, dark-palmed glove. A tracking dog followed a scent from where the perpetrators were

seen leaving the store along the direction they fled, and found rubber gloves on the property of the strip mall where the robbery occurred. Evidence technician Officer Paul Collins testified that he collected an intact glove and one that was in a few pieces and swabbed the gloves for DNA.

About a week after the robbery, Clinton Township Police Detective Jeffrey Barbera went to the scene to help recover the video and still images from the store's surveillance camera. He testified that he was unable to download the surveillance video to a disc or thumb drive, but he viewed the evidence and it showed that at least one of the robbers was wearing light-colored gloves. Detective Barbera explained that, because he could not download the surveillance video, he used his department-issued cell phone to record clips from the video in accordance with instructions he had received from the detective in charge of the case at the time, Detective Michael Friese. None of the recorded images recorded from the robbery video clearly showed defendant wearing gloves.

In October 2014, the case was assigned to Detective Bryan Gilbert because Detective Friese had retired. Detective Gilbert testified that he developed a lead on a suspect, Roberto Dupree. The detective compared a driver's license photograph from the Secretary of State to the images on video and still images of the robbery and concluded that they depicted the same man. A search warrant to collect defendant's DNA with two buccal swabs was obtained in March 2016. Detective Gilbert transported the evidence to the Michigan State Police laboratory in Northville.

Michigan State Police forensic science expert Andrea Young determined that the DNA sample from defendant matched the DNA that was the major sample found on a rubber glove that was found near the smoker's store. Young calculated that the chances for this match were one in one hundred and sixty point eight quadrillion African-Americans (160,800,000,000,000,000), and one in eight point six eight one quintillion Caucasians (8,681,000,000,000,000,000). An independent laboratory evaluated the State Police's examination of the DNA evidence, and agreed that defendant's DNA matched the DNA from the glove. Julie Anne Howenstine, a biology and DNA specialist at Speckin Forensics, LLC, a private forensic consulting group, was qualified without objection as a DNA expert. Howenstine determined that the glove DNA had become too diluted to conclusively associate it with the buccal swab DNA. Nevertheless, Howenstine agreed that defendant's DNA was a major donor of the DNA collected from the glove found near the scene of the robbery and testified that she found no "technical or interpretational errors" in the work of the MSP forensic science technicians.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first contends that, under Michigan law, convictions involving tracking-dog evidence must be supported by direct evidence, and because the prosecution did not present any direct evidence of his participation in the armed robbery at issue, the evidence is insufficient to sustain his conviction. We disagree.

When reviewing a challenge to the sufficiency of the evidence, "this Court reviews the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond

a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citation omitted).

Defendant relies on *People v Perryman*, 89 Mich App 516; 280 NW2d 579 (1979), to support his position that direct evidence is required to sustain his conviction. In *Perryman*, this court held prospectively that "a court has a duty, even absent a request by counsel, to inform the jury that tracking dog evidence: must be considered with caution; is of slight probative value; and if found reliable, cannot support a conviction in the absence of other *direct* evidence of guilt." *Perryman*, 89 Mich App at 523 (emphasis added). The preference for direct evidence expressed in *Perryman* arose from this Court's reliance on a decision out of New York's Oneida County, *People v Centolella*, 61 Misc2d 723; 305 NYS2d 279 (1969). In *Centolella*, the Oneida County court concluded that, because the jury would likely give undue importance to tracking-dog evidence, "in the absence of some other direct evidence of guilt[, tracking-dog evidence] would not warrant a conviction." *Centolella*, 61 Misc2d at 725. In addition, this Court appeared to be responding to similar concerns previously expressed in *People v McPhearson*, 85 Mich App 341; 271 NW2d 228 (1978), by more clearly defining the "corroborating evidence" necessary in tracking-dog cases. Nevertheless, defendant's reliance on *Perryman* is misplaced for two reasons.

First, it was a well-settled principle of Michigan law by the time this Court decided *Perryman* that the elements of a crime may be "proved by circumstantial evidence and reasonable inferences therefrom." See *Peterson v Oceana Circuit Judge*, 243 Mich 215, 217; 219 NW 934 (1928) (indicating that the *corpus delicti* of the crime at issue "may be proved by circumstantial evidence.") To interpret *Perryman* as specifically requiring direct evidence in tracking dog cases would be contrary to this principle. Second, this Court has never interpreted *Perryman* as requiring direct evidence, understood as "evidence based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Black's Law Dictionary*, (11th ed, 2019). Rather, it has interpreted *Perryman* consistently with *McPherson*, 85 Mich App at 343-346, and its progeny as requiring corroborating evidence in tracking-dog cases, but not necessarily direct evidence. See, e.g., *People v Laidlaw*, 169 Mich App 84, 93; 425 NW2d 738 (1988) (indicating that tracking-dog, alone, is insufficient to establish identity; "there must be other corroborating evidence presented before identification is sufficient to support a guilty verdict"); *People v Riemersma*, 104 Mich App 773, 781; 306 NW2d 340 (1981) (concluding that "sufficient circumstantial evidence was introduced" to corroborate the tracking-dog evidence). Thus, under Michigan law, tracking-dog evidence is not sufficient to support identification in a criminal trial by itself. Such evidence must be accompanied by other evidence, evidence that is not "fragmentary or unsubstantial," but it need not be accompanied by direct evidence. See *McPherson*, 85 Mich App at 344. A conviction may rest on circumstantial evidence and reasonable inferences therefrom. See *People v Hardiman*, 466 Mich 417, 422-429; 646 NW2d 158 (2002); see also *Peterson*, 243 Mich at 217.

Our review of the record convinces us that the prosecutor presented evidence sufficient to allow a jury to find beyond a reasonable doubt that defendant committed the charged crime. The jury convicted defendant of armed robbery under a theory of aiding and abetting. In order to prove that defendant aided and abetted the commission of armed robbery, the prosecution had to prove

-3-

that " '(1) [armed robbery[1]] was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted in the commission of [armed robbery]; and (3) the defendant intended the commission of [armed robbery] or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.' " *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010), quoting *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citations omitted).

Defendant's argument centers on whether the evidence was sufficient to allow a jury to identify him beyond a reasonable doubt as one of the unarmed perpetrators of the armed robbery. We conclude that it was.

The victim testified to the details of the armed robbery, although he could not identify defendant as one of the robbers. In particular, the victim testified that while one man held a gun on him, the two other men took him to the back of the store and bound him with duct tape. Officer Terzo and Detective Barbera testified that video surveillance showed that one of the unarmed robbers was heavyset, bald, and wearing gloves. DNA was collected from a glove found in the vicinity of the robbery by the tracking dog. Following up on a lead, Detective Gilbert compared a driver's license photo of defendant with images from the surveillance camera, found that they matched, and obtained a search warrant to collect defendant's DNA. The forensic technician from the Michigan State Police testified that the glove DNA matched the DNA collected from defendant pursuant to the warrant, and that the odds of it matching someone else's DNA were infinitesimally small. Defendant's DNA expert also testified that defendant was the primary donor of the glove DNA. In addition to eliciting this testimonial evidence, the prosecution showed the jury the video images from the robbery and the photograph of defendant's driver's license used by Detective Gilbert. Although defendant focuses on the activity of the tracking dog, it was not the tracking dog that identified defendant; in fact, the dog's handler testified that the dog lost the scent it was following shortly after finding the glove from which defendant's DNA was collected. It was routine investigative work that linked the glove to defendant by means of DNA testing.

We conclude that, viewed in the light most favorable to the prosecution, *Meissner*, 294 Mich App at 452, the evidence presented to the jury was sufficient to allow the jury to conclude beyond reasonable doubt that defendant was one of the participants aiding and abetting the gunman in the armed robbery of the Smoker's Only store.

## B. INSTRUCTIONAL ERROR

Defendant next contends that the trial court erred by giving the jury a tracking-dog instruction that did not state that direct evidence was required to convict him of the charged crime. Defendant waived this issue when defense counsel expressly approved of the jury instructions. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) ("When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a

---

[1] "The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon." *People v Smith*, 478 Mich 292, 319; 733 NW2d 351 (2007).

-4-

waiver."). Because a waiver extinguishes any error, there is no error for this Court to review. See *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000).

Defendant contends in the alternative that his trial counsel rendered constitutionally ineffective assistance by failing to object to the allegedly erroneous jury instruction. In order to establish that his counsel provided ineffective assistance, defendant must show (1) "that counsel's performance was deficient" and (2) "that counsel's deficient performance prejudiced the defense." *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007) (quotation marks and citation omitted). A counsel's performance is deficient if "it fell below an objective standard of professional reasonableness." *Id*. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

With regard to tracking-dog evidence, the court instructed the jury as follows:

> You have heard testimony about the use of tracking dog, of a tracking dog. You must consider tracking-dog evidence with great care and remember that it has little value as proof. Even if you decide that it is reliable, you must not convict the defendant based only on tracking-dog evidence. There must be other evidence that the defendant is guilty.

As discussed above, this instruction is perfectly consistent with Michigan law. See *McPherson*, 85 Mich App at 343-346. Thus, defendant cannot establish that his trial counsel performed deficiently by not objecting to this instruction or by failing to advance the meritless argument that direct evidence was required to convict defendant of the charged crime. *Ericksen*, 288 Mich App at 201. Because he has not established that trial counsel's performance was deficient, *Taylor*, 275 Mich App at 186, defendant's ineffective assistance claim must fail.

## C. OFFENSE-VARIABLE ASSESSMENT

Defendant next contends that the trial court erred in assessing offense variables (OVs) 1, 2, and 4. We disagree. This Court reviews the trial court's factual determinations at sentencing for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

"A defendant is entitled to be sentenced by a trial court on the basis of accurate information." *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). The court must consult the advisory sentencing guidelines and assess the highest amount of possible points for all offense variables. *People v Lockridge*, 498 Mich 358, 392 n 28; 870 NW2d 502 (2015). The trial court's factual determinations regarding offense variables must be supported by a preponderance of the evidence. See *People v Osantowski*, 481 Mich 103, 111; 748 NW2d 799 (2008).

### 1. OV 1 AND OV 2

Defendant argues that the trial court erred in assessing 15 points for OV 1 because he did not have a gun and no one else has been charged or convicted of the armed robbery.

OV 1 assesses the "aggravated use of a weapon," MCL 777.31(1). The trial court may score 15 points where "[a] firearm was pointed at or toward a victim . . ." MCL 777.31(1)(c). Further, "[i]n multiple offender cases, if 1 offender is assessed points for the presence or use of a weapon, all offenders shall be assessed the same number of points." MCL 777.31(2)(b).

We agree that defendant did not possess a weapon during the armed robbery of the smoker's store, but we reject his argument that the trial court erred in scoring 15 points for OV 1 because no other offender has been identified, charged, or convicted of the armed robbery. The sentencing guidelines do not require that the other offenders be identified, charged, and convicted before any of the offenders may be assessed points under OV. That defendant was the first, and might be the only, offender identified, charged, and convicted of the armed robbery is irrelevant for purposes of scoring OV 1. Further, a person convicted of committing a crime under an aiding-and-abetting theory "shall be punished as if he had directly committed such offense." MCL 767.39. Scoring the sentencing guidelines is an integral part of determining the punishment for one convicted of a crime.

In the present case, the evidence established that the principal pointed a gun at the victim during the robbery, the jury convicted defendant of armed robbery as an aider and abettor, MCL 767.39 requires defendant to receive the same "punish[ment] as if he had directly committed [armed robbery,]" and OV 1 requires all offenders to receive the same score, without regard to whether the other offenders were prosecuted and convicted. In light of the facts of this case and the governing law, we find no error in the trial court's scoring of OV 1.

Defendant raises a similar argument with regard to the trial court's assessment of five points for OV 2. Five points is scored for OV 2 when "[t]he offender possessed or used a pistol, rifle, shotgun, or knife or other cutting or stabbing weapon." MCL 777.32(1)(d). As in OV 1, OV 2 also states that "[i]n multiple offender cases, if 1 offender is assessed points for possessing a weapon, all offenders shall be assessed the same number of points." MCL 777.32(2). For the reasons discussed with respect to OV 1, the trial court did not err in scoring five points for OV 2 on the basis of the unidentified principal's use of a pistol.

## 2. OV 4

Defendant next contends that the trial court erred by scoring 10 points for OV 4, which considers the psychological injury to a victim. A trial court must assess 10 points "if serious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). That treatment has not been sought is not conclusive. MCL 777.34(2). A score of zero is proper where "[n]o serious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). "A sentencing court may consider all record evidence before it when calculating the guidelines, including, but not limited to, the contents of a presentence investigation report, admissions made by a defendant during a plea proceeding, or testimony taken at a preliminary examination or trial." *People v Johnson*, 298 Mich App 128, 131; 826 NW2d 170, 172 (2012) (quotation marks and citation omitted).

This Court has found adequate evidence to support a trial court's assessment of 10 points for OV 4 where the victim of a bank robbery indicated in her victim impact statement that she suffered from sleeplessness for weeks after the robbery and was constantly afraid of being robbed

by her customers. *People v Earl*, 297 Mich App 104, 110; 822 NW2d 271 (2012). The victim in the present case told the presentence investigator that the robbery "shook him up and made him nervous and scared for at least six months after the instant offense occurred." The victim also told the investigator that he became nervous whenever someone walked into his store, and he was afraid he would be robbed again. This evidence is sufficient to support the trial court's assessment of 10 points for OV 4 in this case. See *id*.

## D. STANDARD 4 ISSUES

In addition to the issues raised by appellant counsel in defendant's main brief to this Court, defendant raises a number of issues in a Standard 4 brief.[2]

### 1. FAILURE TO PRESERVE EVIDENCE

Defendant first alleges that the failure of police to a preserve and disclose all of the surveillance video from the day of the robbery violated his right to due process by denying him a fair trial. This Court reviews constitutional claims de novo. *People v Bosca*, 310 Mich App 1, 26-27; 871 NW2d 307 (2015).

"To warrant reversal on a claimed due-process violation involving the failure to preserve evidence, a defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith." *People v Dickinson*, 321 Mich App 1, 16; 909 NW2d 24 (2017) (quotation marks and citation omitted). Exculpatory evidence is evidence that would raise a reasonable doubt about defendant's guilt. *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994). Generally, bad faith requires a showing of malicious or intentionally wrongful conduct. See *Flones v Dalman*, 199 Mich App 396, 401; 502 NW2d 725 (1993).

Defendant has not met his burden to prove that the missing video was exculpatory. Defendant argues that the video of the robbery was exculpatory because he could have used it to impeach Sergeant Terzo's statement that the heavyset man in the video was wearing clear or yellow rubber gloves. Defendant implies that the video would have shown that the heavyset, bald, light-skinned robber was not wearing gloves. However, defendant has given this Court no reason to view his implication as anything more than mere speculation. At best, defendant has shown no more than that the complete video might have been "potentially useful." The failure to preserve evidence that is merely "potentially useful" is not a due-process violation unless a defendant establishes bad faith. *People v Huttenga*, 196 Mich App 633, 642; 493 NW2d 486 (1992), citing *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988).

Likewise, defendant has not demonstrated that the police acted in bad faith by not preserving the entire video of the robbery. The victim explained that he did not know how to transfer the video to the police, Sergeant Terzo stated that she could not download the video because neither she nor the evidence technician had the USB memory card that the victim said was needed. Moreover, Detective Barbera, who had some familiarity with technology, was unable to

---

[2] A "Standard 4" brief refers to a brief filed on behalf of an indigent criminal defendant pursuant to Michigan Supreme Court Administrative Order 2004-6, Standard 4.

transfer the video to a disc or thumb drive. Even if we assume for the sake of argument that police should have found someone or some way to preserve the entire portion of the video recording the robbery, we find no evidence that the inability of the police to download the video was feigned or that the decision to record the portions of the video potentially helpful in solving the crime constituted malicious or intentionally wrongful conduct. See *Flones*, 199 Mich App at 401. Defendant having failed to demonstrate that the complete video was exculpatory or that the police acted in bad faith, his due-process claim must fail. See *Dickinson*, 321 Mich App at 16.

## 2. EXPERT DETERMINATION

Defendant next argues that the trial court violated his right to due process by denying him a fair trial when the court declined to qualify Macomb County Sheriff Deputy Dave Quartuccio, the tracking dog's handler, as an expert witness. Again, we find no error.

The qualification of a witness as an expert and the admissibility of his testimony are in the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion. *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). An abuse of discretion occurs if the trial court's decision results in an outcome outside the range of principled outcomes. See *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

If the trial court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert may testify to the knowledge by opinion or otherwise, if the testimony is based on sufficient facts or data, is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *People v Dobek*, 274 Mich App 58, 93-94; 732 NW2d 546 (2007), citing MRE 702. Canine officers can be qualified as experts under MRE 702 by satisfying the test for reliability of tracking-dog evidence. See *People v Lane*, 308 Mich App 38, 52-53, 54-55; 862 NW2d 446 (2014); *Laidlaw*, 169 Mich App at 93. In order to establish that tracking-dog evidence is sufficiently reliable, it must be demonstrated that:

> (1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it. [*Lane*, 308 Mich App at 53, citing *People v Harper*, 43 Mich App 500, 508; 204 NW2d 263 (1972).]

In the present case, the trial court found that the tracking-dog evidence met the four-part standard for reliability, but declined to qualify Deputy Quartuccio as an expert for purposes of the trial. The court expressed its concern that, if it qualified the deputy as an expert, the jury could give extra weight to the tracking-dog evidence and not view the evidence with the appropriate level of caution. In the trial court's view, admitting the deputy as an expert would run contrary to the instruction the court planned to give the jury to view the tracking-dog evidence with caution.

This Court has observed that there is a "danger that a jury may place undue importance on evidence of this type," and that tracking-dog evidence "is to be treated with caution." *Perryman*,

89 Mich App at 523-524. The trial court's decision to admit the tracking-dog evidence based on its reliability, but to decline to declare Deputy Quartuccio an expert witness, accords with this concern. Defendant argues that the trial court's decision to not qualify Deputy Quartuccio as an expert witness prejudiced him by denying him the opportunity to receive, and challenge, the foundational data underlying the canine team's qualifications. Specifically, defendant sought more detailed information about the tracking dog's success rate. However, Deputy Quartuccio testified that he was not required to document the dog's success rate. Thus, the detailed performance records that defendant assumes existed may not, in fact, have existed. Further, the record shows that defendant was able to voir dire the qualifications of Deputy Quartuccio and the tracking dog and to cross-examine Quartuccio regarding the dog's reliability and performance. On this record, we cannot say that the trial court's decision not to qualify Deputy Quartuccio as an expert witness resulted in an outcome outside the range of principled outcomes. See *Babcock*, 469 Mich at 269. Accordingly, we find no due-process violation.

### 3. DELAYED DISCOVERY

Somewhat related to the previous issue is defendant's assertion of a due-process violation arising from the prosecution's alleged late disclosure of evidence about the canine unit's qualifications and its failure to provide information about the unit's success rate. Contrary to defendant's claim on appeal, the prosecution did not refuse to provide the discovery. Defendant requested the records related to the canine unit two weeks before trial. Subsequently, the prosecution contacted the Macomb County Sheriff's Department and obtained and turned over the records about the handler's training and the dog's qualifications six days before trial. With regard to records about the tracking dog's success rate, defendant's assumption that such records exist was belied by the testimony of the dog's handler that he was not required to keep such records. Even without such records, defense counsel had an extensive opportunity to voir dire the dog's handler about the dog's reliability and accuracy in tracking situations, and he thoroughly cross-examined the handler. See *Florida v Harris*, 568 US 237, 247; 133 S Ct 1050, 1057; L Ed 2d 61 (2013) (stating that a defendant must have an opportunity to challenge evidence of a dog's reliability, "whether by cross-examining the testifying officer or by introducing his own fact or expert witness"). On this record, we cannot say that defendant suffered violation of his right to due process.

### 4. PREARREST DELAY

Defendant next contends that the unreasonable delay prior to his arrest violated his right to due process by precluding him from obtaining exculpatory evidence from the unpreserved surveillance video and from DNA evidence. For the reasons stated below, we find no error.

Because this issue comes to the Court unpreserved, our review is for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Under plain error review, the defendant bears the burden to demonstrate that an error occurred, that the error was clear or obvious, and that the error affected his or her substantial rights. *Id.* In order to establish the last element, the defendant must show that the error "affected the outcome of the lower court proceedings." *Id.* Even if the defendant establishes a plain error that affected his or her substantial rights, reversal will be "warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant" or when the error "seriously affect[ed] the

fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 763-764 (quotation marks and citation omitted).

A defendant's right to due process can be violated when a prearrest delay causes "substantial prejudice to a defendant's right to a fair trial and . . .was used to gain tactical advantage[.]" *People v Woolfolk*, 304 Mich App 450, 454; 848 NW2d 169 (2014). To establish a due-process violation arising from prearrest delay, a defendant must demonstrate "actual and substantial prejudice to his right to a fair trial[.]" *People v Musser*, 259 Mich App 215, 220; 673 NW2d 800 (2003). "Substantial prejudice is that which meaningfully impairs the defendant's ability to defend against the charge in such a manner that the outcome of the proceedings was likely affected." *People v Patton*, 285 Mich App 229, 237; 775 NW2d 610 (2009). "[A] defendant cannot merely speculate generally that any delay resulted in lost memories, witnesses, and evidence . . .even if the delay was a long one." *Woolfolk*, 304 Mich App at 454, citing *United States v Marion*, 404 US 307, 325-326; 92 S Ct 455; 30 L Ed 2d 468 (1971).

Defendant argues that the time lapse between March 2014, when he was identified in the CODIS database, and October 2015, when police arrested him, prevented him from obtaining exculpatory evidence from the unpreserved surveillance video. As discussed elsewhere in this decision, defendant has not established that the unpreserved video contained exculpatory information. Moreover, he has not established that the video was even available in March 2014, 15 months after the armed robbery. Defendant also argues that the delay may have resulted in the officers' lack of recollection regarding how they had attempted to download the video before recording it. Not only is defendant's assertion speculative, but he cannot establish prejudice with general allegations of lost memories. *Woolfolk*, 304 Mich App at 454.

Defendant further argues that prearrest delay resulted in less DNA being available for testing. The evidence technician testified that he swabbed the gloves found in the vicinity of the robbery for DNA after he collected them on the day of the crime. Because the DNA evidence itself was promptly processed, defendant's argument that additional DNA would have been available for testing had there been less pretrial delay merely speculates about evidence presumed to be lost; it does not establish "actual and substantial prejudice to his right to a fair trial." *Musser*, 259 Mich App at 220; see *Woolfolk*, 304 Mich App at 454.

In order to establish a due-process violation arising from prearrest delay, defendant must show both substantial prejudice and that the delay was used to gain a tactical advantage. *Woolfolk*, 304 Mich App at 454. Defendant has not met his burden to show that substantial prejudice resulted from the delay, but even if he had, his mere speculation about "lost memories, witnesses, and evidence," is insufficient to show that prearrest delay was used to gain a tactical advantage. *Id*. Because defendant did not meet his burden to show that substantial prejudice and a tactical advantage resulted from the prearrest delay in this case, *id*., he has not shown plain error affecting his substantial rights, and his claim of a due-process violation must fail, *Carines*, 460 Mich at 763.

## 5. SPEEDY TRIAL VIOLATION

Finally, defendant argues that his right to a speedy trial was violated. "Whether a defendant was denied his constitutional right to a speedy trial is a mixed question of fact and law." *People v Gilmore*, 222 Mich App 442, 459; 564 NW2d 158, 167 (1997). We review factual findings for

clear error and constitutional questions de novo. *Id*. Dismissal with prejudice is the only remedy for a violation of the Sixth Amendment right to a speedy trial. *Barker v Wingo*, 407 US 514, 522; 92 S Ct 2182, 2188; 33 L Ed 2d 101 (1972).

To determine whether a defendant has been denied the right to a speedy trial, the Court balances the following four *Barker* factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *People v Williams*, 475 Mich 245, 261-262; 716 NW2d 208 (2006). "The "time for judging whether a defendant's right to a speedy trial was violated runs from the date of the defendant's arrest." *Id*. at 261. Prejudice is presumed after a delay of 18 months, thus triggering "an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id*. at 262 (quotation marks and citation omitted).

The first *Barker* factor is the length of the delay. This factor favors defendant. The delay of two-and-a-half years between defendant's October 2015 arrest and the May 2018 beginning of his trial is presumptively prejudicial. Thus, this Court must consider the other *Barker* factors to determine if defendant was deprived of his right to a speedy trial. See *Id*. Because he asserted his right to a speedy trial, the third *Barker* factor also favors defendant.

The second *Barker* factor is the reason for the delay. This factor favors the prosecution, as the record shows that most of the pretrial delay was attributable to defendant. Defendant filed numerous motions, which required hearings and, in some instances, adjournment to await more information. He had four successive court-appointed attorneys, each of which required time to become familiar with the case. In February 2016, defendant withdrew a plea that he had entered the previous month, which led to a rescheduled trial date and a further adjournment so that defendant's second court-appointed attorney could try to negotiate another plea agreement. Delays accompanied defendant's two competency evaluations, and a lengthy wait ensued for the DNA results defendant requested from an independent laboratory.

The fourth *Barker* factor concerns prejudice to the defendant and is critical to the analysis of whether defendant's speedy trial rights were abridged. *Cain*, 238 Mich App at 112. "There are two types of prejudice: prejudice to the person and prejudice to the defense." *Gilmore*, 222 Mich App at 461-462. Regarding prejudice to the person, defendant claims that he suffered anxiety over his loss of liberty and whether he would be able to prove his innocence, and that this anxiety necessitated two competency evaluations and caused him to breakdown in front of the jury. Regarding prejudice to the defense, defendant alleges that the delay resulted in fading memories of the witnesses and the alleged disappearance of the original DNA swab from the glove found in the vicinity of the robbery.

"[A]nxiety, alone, is insufficient to establish a violation of defendant's right to a speedy trial." *Id*. at 462. Defendant asserts that his anxiety was such as to result in two competency evaluations and a "breakdown" in front of the jury. Review of the record, however, calls into question defendant's assertions that his anxiety was attributable specifically to pretrial delay.

The trial court ordered defendant to undergo a competency evaluation in October 2016, less than one year after his arrest, and in November 2017. In both cases, the reason for the order was substantially the same: to determine whether defendant was capable of working with his

-11-

attorney. Defendant alleged that each of his attorneys was working against him by, among other things, preventing his motions from being heard. At the October 2016 hearing that resulted in the trial court's first order for a competency evaluation, the court explained to defendant that it had granted his motions for an independent DNA expert to analyze the DNA evidence in the case, but that his additional motions could not be heard until the expert and the laboratory had finished their work. Nevertheless, defendant continued to insist that he wanted all of his motions heard and either granted or denied, and to see the court's failure to operate in accordance with his expectations as evidence of sabotage. The November 2017 order calling for a second competency evaluation was issued for similar reasons. Defendant's latest attorney had alleged that defendant "exhibited a lack of understanding and recollection of past proceedings" that made formulating a defense strategy "impossible," that he believed defendant was not competent to make legal decisions on his own, and that defendant believed that counsel was working against his best interests. In our view, the record suggests that defendant was anxious about the outcome of his case, which is to be expected, see *Barker*, 407 US at 537 (WHITE, J., concurring), and took matters into his own hands, filing or causing to be filed numerous motions. Failing to understand or to accept explanations of how court proceedings worked, defendant interpreted variations from his expectations as evidence of ill intent on the part of his attorneys and the court. This appears to have been defendant's consistent pattern, and nothing in the record suggests that it was caused specifically by the delay in bringing him to trial.

Defendant also attributes his "breakdown" in front of the jury to pretrial delay. The "breakdown" occurred when, during defense counsel's closing argument, defendant said, "Don't railroad me, man. I ain't had nothing to do with that crime. Nothing man." The court excused the jury and reprimanded defendant for what the court considered a "knowing and purposeful attempt at playacting." The court interpreted defendant's outburst as an attempt to do what he had already "coolly and calmly and rationally" indicated on the record he would not do, namely, testify. The trial court stated, "I have watched his demeanor and his skill in trying to set things up in his favor over these many months and this is yet another example of his purposeful, malicious, pre-planned attempts to foil the system[,]" and concluded by holding defendant in contempt. When the court allowed defendant to respond, defendant claimed that his attorney was intentionally trying to get the jury to convict him of aiding and abetting so that he could be sentenced to life, and had not once told the jury that he was innocent. Defendant's outburst, like the behavior that resulted in the two competency evaluations, appears to have been motivated by anxiety over the outcome of the trial and the mandatory minimum sentence of 25-years defendant faced if found guilty, given his prior felony convictions. MCL 769.12(1)(a). Anxiety over his potential sentence was what caused defendant to withdraw his plea in February 2016, and it appears to have continued to inform his decisions throughout the proceeding. Nothing in the record indicates that defendant's "breakdown" was motivated by anxiety brought on or increased by the length of the pretrial delay.

Turning next to the alleged prejudice to the defense, defendant asserts that the delay impaired witnesses' memories of what they "allegedly observed on surveillance video" from the night of the robbery. The only two witnesses who testified to viewing the surveillance video of the armed robbery were Sergeant Terzo and Detective Barbera, and both testified that the heavyset, bald, light-skinned robber wore clear or yellow gloves. Defendant had the opportunity to bring any issues with the witnesses' observations to the jury's attention through argument and cross-examination. In addition, the testimony of Sergeant Terzo and Detective Barbera did not call into question the testimony of Detective Gilbert, who said that the video image of the heavyset robber

matched that on defendant's driver's license, or the DNA evidence against defendant. In addition, the jury was able to view the video images and defendant's driver's license photograph and judge for itself whether defendant was pictured in the video. In view of this, we cannot say that the delay resulted in prejudice to defendant arising from the impaired memories of police witnesses. See *US v Hagler*, 700 F3d 1091 (CA 7, 2012) (finding that a 10-year delay did not prejudice the defendant where the witnesses told the same basic story, defendant was able to bring any weaknesses in their testimony to the jury's attention through cross-examination, and the witnesses' recollections did not call into question the physical evidence against the defendant).

Defendant also asserts that pretrial delay resulted in the loss of the original DNA swabs of the gloves found near the scene of the record. Defendant observes, however, that these swabs were reported missing in September 2016. Given that the swabs were unavailable less than a year after defendant's arrest, he cannot show that their loss was the result of pretrial delay. Nor can he show prejudice to the defense. Defendant's DNA expert testified that she was able to obtain sufficient DNA to perform an independent analysis by combining the DNA extracted from the original swabs with DNA she extracted from the glove found in the vicinity of the robbery. In light of the foregoing, we conclude that defendant has failed to show prejudice to his defense from pretrial delay.

In conclusion, although *Barker* factors one and three favor defendant, factors two and four favor the prosecution. The record establishes that the pretrial delays in this case were primarily for the purpose of ensuring that defendant was satisfied with counsel and competent to aid in his defense and that all of defendant's motions were heard. Nothing indicates that the delay between arrest and trial prejudiced defendant personally or prejudiced his defense. Defendant was anxious about the mandatory minimum sentence he faced and frustrated that proceedings did not unfold in accordance with his expectations, but nothing in the record suggests that any personal prejudice arose from pretrial delay. Finally, defendant's claims of prejudice to his defense are speculative and unsupported by the record. On the record before us, we cannot say that defendant has established a speedy trial violation warranting reversal of his conviction.

## III. CONCLUSION

We conclude that the prosecution's evidence was sufficient to allow a jury to find beyond a reasonable doubt that defendant committed the charged crime, that the trial court instructed the jury in accordance with the law regarding cases involving tracking dog evidence, and that the trial court did not abuse its discretion in scoring OVs 1, 2, and 4. In addition, we conclude that defendant has failed to establish any due-process violations or speedy trial violations requiring reversal.

Affirmed.

/s/ Jane M. Beckering
/s/ Mark J. Cavanagh
/s/ Cynthia Diane Stephens

-13-